Nicole France Stanton (020452)
Nicole.Stanton@quarles.com
Quarles & Brady LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391
Telephone 602.229.5200

Paul D. Clement*
H. Christopher Bartolomucci*
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com
cbartolomucci@kirkland.com
*Admitted *pro hac vice*

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Summit Law School, LLC, a Delaware corporation; and InfiLaw Corporation, a Delaware corporation,<br><br>        Plaintiffs,<br><br>      vs.<br><br>American Bar Association, an Illinois corporation; Council of the Section of Legal Education and Admissions to the Bar, American Bar Association; and Accreditation Committee of the Section of Legal Education and Admissions to the Bar, American Bar Association,<br><br>        Defendants. | No. 2:18-CV-01580-PHX-DGC<br><br>**AMENDED COMPLAINT**<br><br>(Jury Trial Demanded) |

Plaintiffs, Arizona Summit Law School, LLC and InfiLaw Corporation, by and through their attorneys at Kirkland & Ellis LLP and Quarles & Brady LLP, bring this civil action against Defendants—American Bar Association; Council of the Section of Legal Education and Admissions to the Bar, American Bar Association; and Accreditation

Committee of the Section of Legal Education and Admissions to the Bar, American Bar Association (collectively, "ABA")—and allege as follows:

### NATURE OF THE ACTION

1. This is a civil action for declaratory and injunctive relief and damages to remedy the ABA's violations of due process in its role as an accrediting agency. The ABA issued decisions regarding the accreditation of Arizona Summit Law School on December 6, 2016, March 27, 2017, October 3, 2017, January 3, 2018, April 27, 2018, and June 8, 2018 (collectively, "the Decisions"). As explained herein, the ABA in the Decisions violated its obligation to provide due process to the law school.

### PARTIES

2. Plaintiff Arizona Summit Law School, LLC operates a law school, the Arizona Summit Law School ("Arizona Summit" or "the law school"), in Phoenix, Arizona. Arizona Summit was founded in 2005. The ABA fully accredited (or, in the ABA's terminology, fully "approved") the law school in 2010. Until 2013, Arizona Summit was known as the Phoenix School of Law.

3. Plaintiff InfiLaw Corporation ("InfiLaw") owns Arizona Summit Law School, LLC.

4. Defendant American Bar Association is a corporate entity organized into various components, including the "Council" and the "Committee," as described below.

5. Defendant Council of the Section of Legal Education and Admissions to the Bar, American Bar Association ("Council") is a component of the American Bar Association.

6. Defendant Accreditation Committee of the Section of Legal Education and Admissions to the Bar, American Bar Association ("Committee" or "Accreditation Committee") was a component of the American Bar Association until the Committee's elimination in August 2018.

7. The American Bar Association, the Council, and the Committee are collectively referred to herein as the "ABA."

QB\152522.00017\55276505.1

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction pursuant to 20 U.S.C. § 1099b(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1332(a)(1).

9.      This Court has jurisdiction under 20 U.S.C. § 1099b(f), which provides: "Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association recognized by the Secretary [of Education] for the purpose of this subchapter and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in an appropriate United States district court."

10.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' civil action against Defendants arises under the Constitution, laws, or treaties of the United States and presents the question whether Defendants violated their federal obligation to provide due process in the accreditation process.

11.      This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1).  Plaintiffs and Defendants are citizens of different States.  Arizona Summit is incorporated in Delaware and has its principal place of business in Arizona.  InfiLaw is incorporated in Delaware and has its principal place of business in Florida.  The American Bar Association is incorporated in Illinois and has its principal place of business in Illinois.  The Council and the Committee are components of the American Bar Association and are not separately incorporated.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).  The Committee sent its Decisions to Arizona Summit's address in Phoenix, and the law school received the Decisions in Phoenix.

QB\152522.00017\55276505.1

## **FACTUAL ALLEGATIONS**

### ***ABA Accreditation***

13.    Pursuant to 34 C.F.R. Part 602, the DOE has recognized the Council as the agency for accrediting programs in legal education that lead to a professional degree in law and the law schools offering such programs.

14.    The DOE's recognition of the Council extended to the Committee for decisions involving continued accreditation of law schools.

### ***ABA Standards 202(a), 301(a), 308(a), 309(a), and 501(b)***

15.    The Council has promulgated Standards and Rules of Procedure for Approval of Law Schools ("Standards").

16.    Standard 202(a) provides:  "The current and anticipated financial resources available to the law school shall be sufficient for it to operate in compliance with the Standards and to carry out its program of legal education."

17.    Standard 301(a) provides:  "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession."

18.    Standard 308(a) provides:  "A law school shall adopt, publish, and adhere to sound academic standards, including those for regular class attendance, good standing, academic integrity, graduation, and dismissal."

19.    Standard 309(b) provides:  "A law school shall provide academic support designed to afford students a reasonable opportunity to complete the program of legal education, graduate, and become members of the legal profession."

20.    Standard 501(b) provides:  "A law school shall only admit applicants who appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

21.    Interpretation 501-1 provides:  "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar

QB\152522.00017\55276505.1

passage rate of its graduates, and the effectiveness of the law school's academic support program."

22.    Interpretation 501-2 provides: "Sound admissions policies and practices may include consideration of admission test scores, undergraduate course of study and grade point average, extracurricular activities, work experience, performance in other graduate or professional programs, relevant demonstrated skills, and obstacles overcome."

23.    The ABA in its Decisions concluded that Arizona Summit was not in compliance with Standards 202(a), 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.

24.    The ABA also concluded in its Decisions that Arizona Summit was not in compliance with Standard 308(a) but subsequently reached the opposite conclusion.

25.    Standards 202(a), 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2 are vague and lack objective metrics for determining compliance or noncompliance.

26.    Maureen O'Rourke, the current Chair of the Council, at a Council meeting held in October 2016 (when she was Chair-elect), publicly admitted what many people involved in the ABA accreditation process have long known:  that the ABA views its own Standards as "fuzzy and hard to enforce."  Chair O'Rourke's admission is contrary to the provisions of the HEA and DOE regulations requiring an accrediting agency to have "*clear* standards" of accreditation.  20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.18(a) (emphasis added).

27.    The ABA did not in any of the Decisions give Arizona Summit any guidance regarding what the law school needed to do or show to return to compliance with the ABA's vague Standards.  That is not how the ABA as an accrediting agency should operate.  The National Advisory Committee on Institutional Quality and Integrity ("NACIQI") makes recommendations to the U.S. Secretary of Education on accreditation matters, including on whether the DOE should recognize the ABA as an accrediting agency.  At NACIQI's June 2016 meeting, NACIQI told ABA representatives present at the meeting, including the

QB\152522.00017\55276505.1

Chair of the Council, that "[w]e want to make sure that the schools that follow your standards clearly understand what you want them to do." The ABA did not do that in the Decisions.

### *Other ABA Standards: 206(a) and 316*

28.     Standard 206(a) provides: "Consistent with sound legal education policy and the Standards, a law school shall demonstrate by concrete action a commitment to diversity and inclusion by providing full opportunities for the study of law and entry into the profession by members of underrepresented groups, particularly racial and ethnic minorities, and a commitment to having a student body that is diverse with respect to gender, race and ethnicity." Arizona Summit complies with Standard 206, is committed to diversity, and has a diverse student body.

29.     Standard 316, captioned "Bar Passage," provides in pertinent part as follows:

Standard 316. BAR PASSAGE

>    (a)     A law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates that it meets any one of the following tests:

>>    (1)     That for students who graduated from the law school within the five most recently completed calendar years:

>>>    (i)     75 percent or more of these graduates who sat for the bar passed a bar examination; or

>>>    (ii)     in at least three of these calendar years, 75 percent of the students graduating in those years and sitting for the bar have passed a bar examination.

>    *   *   *

>>    (2)     That in three or more of the five most recently completed calendar years, the school's annual first-time bar passage rate in the jurisdictions reported by the school is no more than 15 points below the average first-time bar passage rates for graduates of ABA-approved law schools taking the bar examination in these same jurisdictions.

>    *   *   *

>    (b)     A school shall be out of compliance with this Standard if it is unable to demonstrate that it meets the requirements of paragraph (a)(1) or (2).

-6-

* * *

30.     A law school complies with Standard 316 if it satisfies either of two metrics. Under paragraph (a)(1), compliance with Standard 316 is based on ultimate bar pass rates (*i.e.*, the percentage of a law school graduating class that passed a bar examination).  Under paragraph (a)(2), compliance with Standard 316 is based on first-time bar pass rates (*i.e.*, the percentage of a graduating class that passed the bar on the first attempt).

31.     In contrast to such Standards as 202(a) 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2, Standard 316 is a clear standard and sets forth objective metrics for assessing compliance.

32.     Arizona Summit is in compliance with Standard 316 based on the ultimate bar pass rate metric.

33.     Arizona Summit's compliance with Standard 316, the standard specifically governing bar pass, makes it arbitrary and capricious for the ABA to rely on selective bar pass data to conclude that the law school is out of compliance with the ABA's "fuzzy" standards that lack objective metrics for assessing compliance.

### The ABA's Obligation Under Federal Law to Provide Due Process

34.     Several sources of federal law require the ABA to provide due process to the law schools it accredits.

### The HEA and DOE Regulations

35.     The Higher Education Act ("HEA") provides that an accrediting agency recognized by the U.S. Secretary of Education

> shall establish and apply review procedures throughout the accrediting process, including evaluation and withdrawal proceedings, which comply with due process procedures that provide -- (A) for adequate written specification of -- (i) requirements, including clear standards for an institution of higher education or program to be accredited; and (ii) identified deficiencies at the institution or program examined; (B) for sufficient opportunity for a written response, by an institution or program, regarding any deficiencies identified by the agency or association to be considered by the agency or association -- (i) within a timeframe determined by the agency or association; and (ii) prior to final action in the evaluation and withdrawal proceedings[.]

-7-

20 U.S.C. § 1099b(a)(6).

36.     The DOE has promulgated regulations governing due process in the accreditation process ("DOE regulations").   The DOE regulations provide that an accrediting agency "must demonstrate that the procedures it uses throughout the accrediting process satisfy due process."  34 C.F.R. § 602.25.

37.     34 C.F.R. § 602.25, captioned "Due process," provides that an accrediting agency must demonstrate that it:

> (a)     Provides adequate written specification of its requirements, including clear standards, for an institution or program to be accredited or preaccredited.
>
> (b)     Uses procedures that afford an institution or program a reasonable period of time to comply with the agency's requests for information and documents.
>
> (c)     Provides written specification of any deficiencies identified at the institution or program examined.
>
> (d)     Provides sufficient opportunity for a written response by an institution or program regarding any deficiencies identified by the agency, to be considered by the agency within a timeframe determined by the agency, and before any adverse action is taken.
>
> (e)     Notifies the institution or program in writing of any adverse accrediting action or an action to place the institution or program on probation or show cause.  The notice describes the basis for the action.
>
> (f)     Provides an opportunity, upon written request of an institution or program, for the institution or program to appeal any adverse action prior to the action becoming final.
>
> *   *   *
>
> (g)     The agency notifies the institution or program in writing of the result of its appeal and the basis for that result.

34 C.F.R. § 602.25(a)-(g).

38.     Another DOE regulation, 34 C.F.R. § 602.18, captioned "Ensuring consistency in decision-making," provides that an accrediting agency "must consistently apply and enforce [its] standards."  This regulation provides that an agency must set forth

1  "written specification of the requirements for accreditation ... that include clear standards

2  for an institution or program to be accredited." *Id*. § 602.18(a).  The agency also must

3  ensure that it has "effective controls against the inconsistent application of the agency's

4  standards." *Id*. § 602.18(b).  And the agency must provide a law school with "a detailed

5  written report that clearly identifies any deficiencies in the [school's] compliance with the

6  agency's standards." *Id*. § 602.18(e).

7       39.    The HEA and DOE regulations are binding on the ABA.  The HEA and DOE

8  regulations also help to inform the ABA's duty under federal common law right to provide

9  due process to the law schools it accredits.

10  ### The Federal Common Law Duty to Provide Due Process

11       40.    Accrediting agencies such as the Council and the Committee have an

12  obligation under federal common law to provide due process to the law schools they

13  accredit.

14       41.    In recognizing the federal common law duty of due process, courts have

15  observed that accreditation agencies, "like all other bureaucratic entities, can run off the

16  rails." *Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls*.,

17  781 F.3d 161, 169 (4th Cir. 2015).  Courts have recognized that "accreditors wield

18  enormous power over institutions—life and death power, some might say—which argues

19  against allowing such agencies free rein to pursue personal agendas or go off on some

20  ideological toot." *Id*. at 170.

21       42.    Principles of administrative law inform the federal common law duty of due

22  process.

23       43.    An accreditor's decision violates administrative law principles if it is

24  arbitrary, capricious, unreasonable, an abuse of discretion, not in accordance with law,

25  contrary to constitutional right, without observance of procedure required by law, or not

26  based on substantial evidence (collectively, "arbitrary and capricious").

27       44.    An accreditor violates administrative law principles if it fails to provide a

28  reasoned explanation for its decisions.

QB\152522.00017\55276505.1

45.     An accreditor's decisions must be consistent, and the accreditor must provide a reasoned explanation for any departure from past precedent.  *See also* 34 C.F.R. § 602.18 (providing that an accrediting agency "must consistently apply and enforce [its] standards").

46.     Like an administrative agency, an accreditor may not defend a decision on new grounds not set forth by the accreditor in its original decision.

### *Fifth Amendment Due Process*

47.     The Fifth Amendment to the United States Constitution provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

48.     A private entity may be deemed a state actor, and therefore subject to the Due Process Clause of the Fifth Amendment, to the extent that the federal government has delegated governmental functions to the entity, or coerced, pressured, or significantly encouraged the entity to take an action that would be unconstitutional if taken by the government.

49.     InfiLaw officers have information and believe that during the prior Administration one or more DOE officials coerced, pressured, or significantly encouraged the ABA to take adverse accreditation actions against for-profit law schools, including law schools owned by InfiLaw.

50.     In 2017, Daniel Zibel, formerly the DOE Deputy Assistant General Counsel for Postsecondary Education, betraying apparent hostility toward for-profit law schools, publicly touted on social media as one of his personal "achievements" leading the DOE to impose an "unprecedented restriction on a for-profit law school's" access to the Title IV student loan program.  The for-profit law school that Mr. Zibel was referring to was the Charlotte School of Law ("CSL"), an InfiLaw-owned school.

51.     While at the DOE, Mr. Zibel is known to have communicated with the ABA and to have issued demands and orders to the ABA with respect to InfiLaw schools.  These communications reveal that Mr. Zibel used his authority as a DOE official to secretly insert himself in the ABA's process, and that the ABA complied with Mr. Zibel's orders,

-10-

1   including his directive that the ABA not inform an InfiLaw school of his interest and
2   involvement.

3        52.     On February 14, 2017, Mr. Zibel sent ABA Managing Director Barry Currier
4   an email at 10:27 a.m. demanding a copy of CSL's teach out plan filed with the ABA.  Mr.
5   Zibel evidently was not pleased by the speed of Mr. Currier's response.  At 6:30 p.m., Mr.
6   Currier responded, "Not ignoring you.  In California today …. I'll respond tomorrow when
7   I'm back in the office."

8        53.     Three days later, on February 17, 2017, Mr. Zibel emailed Mr. Currier again,
9   stating that "[I]t is my understanding that the Charlotte School of Law has filed a teach out
10  plan with the ABA that involves using the Florida Coastal School of Law as a teach out
11  partner in some fashion."  Mr. Zibel ordered Mr. Currier to provide the teach out plan,
12  invoking "the DOE's authorities, including the authority at 34 CFR 602.27(a)(7)."

13       54.     On February 21, 2017, Mr. Currier forwarded the materials to Mr. Zibel,
14  acknowledging the latter's "request and directive."  On March 2, 2017, Mr. Zibel followed
15  up with Mr. Currier, requesting a phone conversation, which Mr. Currier agreed to have.
16  The substance of their discussion is not known at this time.

17       55.     On June 26, 2017, Mr. Zibel again invoked his governmental authority to
18  demand of Mr. Currier a copy of the ABA's June 2017 decision on CSL.  Although the
19  ABA's decision was not a public document, Mr. Zibel instructed the ABA not to inform
20  CSL of the DOE's demand for the decision.  Mr. Currier on July 6, 2017, complied, stating
21  that "[w]e acknowledge and will comply with the directives included in your email."

22       56.     InfiLaw officers have information and believe that some ABA officials are
23  biased against InfiLaw-owned law schools because of the schools' proprietary status.  DOE
24  regulations require the ABA to control such bias.  Under the DOE regulations, an
25  accrediting agency must have "effective controls against the inconsistent application of the
26  agency's standards."  34 C.F.R. § 602.18(b).

27       57.     Historically, the ABA was opposed to and prohibited the accreditation of
28  proprietary law schools.  In 1995, the U.S. Department of Justice filed a complaint against

the ABA that alleged, among other things, that "[t]he ABA has required that an accredited law school must be organized as a non-profit educational institution." Complaint ¶ 17, *United States v. American Bar Association*, No. 95-1211 (D.D.C. June 27, 1995). The complaint also alleged that "[t]he ABA has never accredited a proprietary law school." *Id.* In 1996, the U.S. District Court for the District of Columbia entered a final judgment prohibiting the ABA from "adopting or enforcing any Standard, Interpretation or Rule, or taking any action that has the purpose or effect of prohibiting a law school from … being an institution organized as a for-profit entity." Final Judgment at 4, *United States v. American Bar Association*, No. 95-1211 (D.D.C. June 25, 1996).

### *The ABA's Decisions on Arizona Summit Violate the*
### *Requirements of Due Process;*
### *The Committee's Decision of December 6, 2016*

58.   On October 27-28, 2016, the Committee held a meeting concerning Arizona Summit and other law schools.

59.   On December 6, 2016, the Committee released to Arizona Summit its decision, which was styled as "Recommendation of the Accreditation Committee, October 2016."

60.   The Committee concluded in its decision that Arizona Summit was not in compliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2. Conclusion (1).

61.   The Committee did not provide a reasoned explanation, or any explanation, for that Conclusion. Instead, the Committee stated: "See Findings of Fact (4)-(39)."

62.   The cited Findings did not support the Committee's conclusion of noncompliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.

63.   The Committee did not explain how the Findings it cited constituted noncompliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-

-12-

1 and 501-2.   The Committee did not even explain which Findings related to which Standards.

64.     The Committee did not explain what Arizona Summit had to do or show to return to compliance with the Standards.  The Committee provided no guidance to Arizona Summit for avoiding future conclusions of noncompliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.

65.     The Committee "further conclude[d]," pursuant to ABA Rule 16(a), that "the issues of non-compliance with 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2 are substantial and have been persistent."  Conclusion (3).

66.     Under ABA Rule 16(a), the ABA may impose sanctions on a law school for "[s]ubstantial or persistent noncompliance with one or more of the Standards."  But the Committee did not explain how the supposed "issues of noncompliance" were "substantial" and "persistent."  Conclusion (3).  Nor did the Committee cite any facts in support of its view that the issues of noncompliance were substantial and persistent.  The Committee did not set forth any tests or criteria for substantiality or persistence.  The terms "substantial" and "persistent" are not defined in the ABA's rules.

67.     Furthermore, Rule 16(a) requires substantial or persistent *noncompliance* with the Standards, not just substantial or persistent "issues" (*i.e.*, questions) of non-compliance.  It is not enough for "issues" to be substantial or persistent; actual noncompliance must be substantial or persistent.  The Committee's substantial and persistent conclusion did not meet the requirements of Rule 16(a).

68.     The Committee recommended to the Council that it place Arizona Summit on probation.  Conclusion (4).  The Council subsequently did so.

69.     In Conclusion (5-d), the Committee required Arizona Summit to provide to all admitted students and publish on its website a public notice, in a form provided by the Committee, stating that the Committee has found the law school not to be in compliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2 ("the Public Notice").  Conclusion (5-d).

-13-

70.     The Public Notice required by the Committee is a compelled speech requirement.  The Public Notice forces Arizona Summit to communicate the ABA's flawed determination and views to the law school's students, prospective students, alumni, faculty, the legal community, and the public.  Furthermore, the ABA's message that Arizona Summit is being forced to communicate is misleading because it is the product of the ABA's due process violations.  The Public Notice inflicts immediate and irreparable injury on Arizona Summit and implicates the same concerns as those underlying the First Amendment's general prohibition against governmental efforts to compel speech from private parties.

71.     The Public Notice has harmed and continues to harm Arizona Summit's ability to attract and retain higher credentialed students and to demonstrate compliance with the ABA Standards and has caused and will cause other substantial damage to the law school, including by making it more difficult to attract and retain students.  The Public Notice requirement inflicts on the law school irreparable injury.

72.     The Committee directed Arizona Summit to publish the Public Notice within five business days of the decision, and the law school timely complied with the directive.

73.     The Committee directed Arizona Summit to communicate to all of its current students, "each semester, within 30 days of the completion of the assignment and distribution of semester grades," the following information: "(a) the Arizona first-time bar examination passage rates, by class quartiles, for Law School graduates sitting for the Arizona bar examinations over the six administrations preceding the semester; and (b) the class quartile in which the student then falls."  Conclusion (5-e).  This directive is referred to herein as the "Bar Pass by Quartile Communication."

74.     The Bar Pass by Quartile Communication requires Arizona Summit to provide incomplete and misleading information to its students.  For example, Arizona Summit is required to tell students that they are in, for example, the 4th quartile and what the 4th quartile pass rates were for the last three years.  The natural inference the ABA wants 4th quartile students to draw from this information is that their pass rate would be

1    similar to that of the 4th quartile students in the past.  But that desired inference is

2    misleading and ignores critical information.  Arizona Summit's current students do not have

3    the same entering qualifications as those of students who took the last six bar examinations.

4    That means that the law school's current third and fourth class quartiles do not align with

5    the class quartiles for the prior six bar exams.   Thus, the Bar Pass by Quartile

6    Communication requires Arizona Summit to give students information that is inaccurate as

7    to their expected pass rates.  In all events, the Bar Pass by Quartile Communication forces

8    Arizona Summit to communicate a misleading message to its students it would not

9    communicate (and could not be directed to communicate) in the absence of the Committee's

10   flawed determinations that fail to comport with due process.

11           75.    Similarly, first year, first semester students would infer from their class

12   quartile that they would perform similarly on the bar examination as those in the same class

13   quartile did on the previous six examinations.  Graduating LGPA is a strong predictor of

14   bar passage, but graduating LGPA and associated rank are not the same thing as cumulative

15   rank and LGPA at earlier periods in a student's law school career.  Furthermore, the strength

16   of LGPA as a predictor for bar pass goes down each semester earlier in a student's law

17   school career—with the LGPA of a first year, first semester student having the least

18   predictive power.  Providing students before their final semester this information (bar pass

19   by graduating LGPA class quartiles and their current class quartile in the same email) has a

20   high risk of giving them a projection of their bar pass for which there is not a sound basis

21   in the statistics.

22           76.    Like the Public Notice, the Bar Pass by Quartile Communication is a

23   compelled speech requirement.  The Bar Pass by Quartile Communication forces Arizona

24   Summit to communicate misleading information to its students.  Like the Public Notice, the

25   Bar Pass by Quartile Communication implicates the same concerns as those underlying the

26   First Amendment's general prohibition against governmental efforts to compel speech from

27   private parties.   It also flows directly from the Committee's flawed accreditation

28   determination.

-15-

77.     The Bar Pass by Quartile Communication has harmed and will harm Arizona Summit's ability to attract and retain higher credentialed students and to demonstrate compliance with the ABA Standards and will cause other substantial damage to the law school.  The Bar Pass by Quartile Communication inflicts further irreparable injury on the law school.

78.     The Committee's decision included a "Notice" stating that the Committee and the Council will take "immediate adverse action" against Arizona Summit if the law school does not demonstrate compliance with the Standards by the end of the two-year period that began on May 18, 2016.  The Notice stated that "[f]or these purposes, adverse action means removal from the list of law schools approved by the American Bar Association."

### *The Council's Decision of March 27, 2017*

79.     On March 10-11, 2017, the Council held a meeting concerning Arizona Summit and other law schools.

80.     On March 27, 2017, the Council released to Arizona Summit its decision, which was styled as "Decision of the Council of the ABA Section of Legal Education and Admissions to the Bar, March 2017."

81.     The Council's decision states that the Council adopted a motion adopting the Committee's Findings of Fact and affirming the Committee's Conclusions with respect to Arizona Summit's non-compliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.

82.     The Council concluded in its decision that Arizona Summit was not in compliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.  Conclusion (1).

83.     The Council did not provide a reasoned explanation, or any explanation, for that Conclusion.

84.     The Council did not explain how the Committee's findings constituted noncompliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.

QB\152522.00017\55276505.1

85.     The Council did not explain what Arizona Summit had to do or show to return to compliance with the Standards.  The Council provided no guidance to Arizona Summit for avoiding future conclusions of noncompliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.

86.     The Council further concluded that "the issues of non-compliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2 are substantial and have been persistent."  Conclusion (2).

87.     The Council placed Arizona Summit on probation, effective March 27, 2017. Conclusion (3).

88.     The Council directed Arizona Summit, within five business days of the decision, to publish on its website and "provide to all admitted students a letter reporting the fact that the Law School has been placed on probation and of the specific remedial actions the Law School is required to take and including a copy of a statement in the form attached" to the Council's decision.  Conclusions (4-d) and (4-e).  The allegations in preceding paragraphs concerning the Committee's Public Notice also apply to the Council's Public Notice.

89.     The Council directed Arizona Summit to communicate to its current students the same information that was required by the Committee's Bar Pass by Quartile Communication. Conclusion (4-f).  The allegations in preceding paragraphs concerning the Committee's Bar Pass by Quartile Communication also apply the Council's directive.

90.     The Council's decision included a "Notice" substantially the same as the one described in Paragraph 78.

### The Committee's Decision of October 3, 2017.

91.     On September 14-15, 2017, the Committee held a meeting concerning Arizona Summit and other law schools.

92.     On October 3, 2017, the Committee released to Arizona Summit its decision, which was styled "Recommendation of the Accreditation Committee, September 2017."

-17-

93.   The Committee concluded that Arizona Summit was not in compliance with Standards 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.  Conclusion (2).

94.   The Committee did not provide a reasoned explanation, or any explanation, for that Conclusion.  Instead, the Committee stated:  "See Findings of Fact (17)-(26) and (28)-(40)."

95.   The cited Findings did not support the Committee's conclusion of noncompliance with Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.

96.   The Committee did not explain how the Findings it cited constituted noncompliance with Standards 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.  The Committee did not even explain which Findings related to which Standards.

97.   The Committee did not explain what Arizona Summit had to do or show to return to compliance with the Standards.  The Committee provided no guidance to Arizona Summit for avoiding future conclusions of noncompliance with Standards 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.

98.   Reversing course from its December 6, 2016 decision, the Committee concluded that Arizona Summit was in compliance with Standard 308(a).  Conclusion (1).  The Committee did not explain how Arizona Summit complied with Standard 308(a) but not Standards 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2.

99.   The Committee stated that it "has reason to believe that the Law School is not in compliance with Standard 202(a) concerning adequacy of its finances."  Conclusion (3).

100.   The Committee recommended to the Council that Arizona Summit "remain on probation and continue the specific remedial actions mandated by the Council in its March 2017 letter."  Conclusion (4).

101.   The Committee's decision did not include any "substantial and persistent" conclusion.

102.   The Committee's decision included a "Notice" substantially the same as the one described in Paragraph 73.

-18-

*The Committee's Decision of January 3, 2018*

103.   On December 7-8, 2017, the Committee held a meeting concerning Arizona Summit and other law schools.

104.   On January 3, 2018, the Committee released to Arizona Summit its decision, which was styled as "Decision of the Accreditation Committee, December 2017."

105.   The Committee in its decision concluded "that the Law School is not in compliance with Standard 202(a) concerning its adequacy of its finances." Conclusion (1).

106.   The Committee did not provide a reasoned explanation, or any explanation, for that Conclusion.  Instead, the Committee stated:  "See Findings of Fact (5)-(17)."

107.   The cited Findings do not support the Committee's conclusion of noncompliance with Standard 202(a).

108.   The Committee did not explain how the Findings it cited constituted noncompliance with Standard 202(a).

109.   The Committee did not explain what Arizona Summit had to do or show to return to compliance with Standard 202(a).  The Committee provided no guidance to Arizona Summit for avoiding future conclusions of noncompliance with Standard 202(a).

110.   The Committee's decision did not include a "substantial and persistent" conclusion.

111.   The Committee's decision included a "Notice" similar to one described in Paragraph 78.  The new Notice, however, included this sentence not found in the prior Notices:  "the Accreditation Committee or the Council may take adverse action prior to the end of the two-year period" that began on May 18, 2016.  The Notice also stated, as had the prior Notices, that "[f]or these purposes, adverse action means removal from the list of law schools approved by the American Bar Association."  Because the January 3, 2018 decision was the first Committee decision to conclude that Arizona Summit was not in compliance with Standard 202(a), a new two-year period should have commenced with respect to that standard; the adverse action period regarding Standard 202(a) should not have related back to May 18, 2016.

-19-

QB\152522.00017\55276505.1

1    112.   Arizona Summit appealed the Committee's decision to the Council.

2    ***The Committee's Decision of April 27, 2018***

3    113.   On March 15-17, 2018, the Committee held a meeting concerning Arizona

4    Summit and other law schools.

5    114.   On April 27, 2018, the Committee released to Arizona Summit its decision,

6    which was styled as "Recommendation of the Accreditation Committee, March 2018."

7    115.   The Committee concluded it is decision that "the Law School is not in

8    compliance with Standard 202(a), requiring sufficient financial resources." Conclusion (1).

9    116.   The Committee did not provide a reasoned explanation, or any explanation,

10   for that Conclusion.  Instead, the Committee stated:  "See Findings of Fact (5)-(15)."

11   117.   The cited Findings do not support the Committee's conclusion of

12   noncompliance with Standard 202(a).

13   118.   The Committee did not explain how the Findings it cited constituted

14   noncompliance with Standard 202(a).

15   119.   The Committee did not explain what Arizona Summit had to do or show to

16   return to compliance with Standard 202(a).  The Committee provided no guidance to

17   Arizona Summit for avoiding future conclusions of noncompliance with Standard 202(a).

18   120.   The Committed "further conclude[d]" that "the issues of non-compliance with

19   Standard 202(a) are substantial and have been persistent." Conclusion (2).

20   121.   The Committee did not explain how the "issues of non-compliance with

21   Standard 202(a)" are "substantial' and have been "persistent." The allegations set forth in

22   Paragraphs 66-67 also apply to this substantial and persistent conclusion.

23   122.   The Committee recommended to the Council that "Standard 202(a) be added

24   to the Standards with which Arizona Summit Law School is out of compliance and for

25   which the Law School is on probation." Conclusion (3).

26   123.   The Committee's decision includes a "Notice" substantially the same as the

27   one described in Paragraph 78.

28

124.    Arizona Summit has appealed the Committee's decision to the Council, which does not stay the decision in any way.

125.    At its meeting on March 15-17, 2018, the Committee considered the status of several law schools, including Arizona Summit and the Western Michigan University Thomas M. Cooley Law School ("Cooley").  On April 18, 2018, the Committee issued to Cooley its decision on that law school.  Previously, in a decision issued to Cooley on October 4, 2017, the Committee had concluded that Cooley was not in compliance with Standard 501(b) and Interpretation 501-1.  But only six months later, in its April 2018 decision, the Committee reversed course and concluded that Cooley is in compliance with Standard 501(b) and Interpretation 501-1.

126.    Also in April 2018, the Committee publicly released a statement regarding its decision on Cooley.  The Committee's public statement explained that Cooley had returned to compliance with the standards because of the "concrete steps taken by the Law School with respect to its admissions policy and practices."

127.    The Committee's April 2018 decision on Cooley is inconsistent with its April 2018 decision on Arizona Summit.  Like Cooley, Arizona Summit has taken "concrete steps" with respect to its admissions policy and practices.  But the ABA did not apply the concrete steps test to Arizona Summit.  By failing to apply its "concrete steps" test to both law schools, the ABA violated its legal duty to "consistently apply and enforce [its] standards." 34 C.F.R. § 602.18.  The DOE regulations require such consistent application and so does the federal common law due process obligation.

128.    The Committee did not attempt to reconcile its decisions on Arizona Summit and Cooley.  The Committee in its decision on Arizona Summit did not provide any explanation for its conclusion that Cooley is in compliance with the Standards but Arizona Summit is not.

129.    One difference between Arizona Summit and Cooley is that the former is a for-profit entity and the latter is not.  But Arizona Summit's for-profit status is not a lawful basis for the ABA to take adverse action against the law school.  Indeed, the Justice

-21-

Department previously obtained an injunction prohibiting the ABA from engaging in such discriminatory treatment.

130.    In none of the Decisions did the ABA cite as precedent any ABA decisions on any other law schools.

131.    The Committee's decision of April 27, 2018, was made no later than March 17, 2018.  The cover letter transmitting the decision to Arizona Summit and signed by Barry Currier, Managing Director of Accreditation and Legal Education, states:  "Attached please find the decision of the Accreditation Committee *at its meeting on March 15-17, 2018*, with respect to the Arizona Summit Law School."  (Emphasis added.)  The Committee violated 34 C.F.R. § 602.26(b), which provides that an accreditation agency must notify a school of an adverse decision "no later than 30 days after it reaches the decision."  In violation of that DOE regulation, the Committee took 41 days, from March 17 to April 27, to notify Arizona Summit of its decision.

132.    On May 10, 2018, the Council held a hearing to consider Arizona Summit's accreditation status.  At the hearing, the Dean of Arizona Summit set forth in detail the many concrete steps the law school has taken to improve its program of legal education and academic support program and thereby come into compliance with the ABA's accreditation standards.

133.    On May 11, 2018, the ABA's Managing Director, Barry Currier, was quoted in the ABA's own publication, the ABA Journal, as saying that the ABA uses a "magic machine" that analyzes a law school's data and "spit[s] out" "triggers or flags" for further inquiry.  Stephanie Francis Ward, *ABA Legal Ed Council Approves Proposed Rule Change to End Admission Test Requirement*, ABA Journal (May 11, 2018).  The article in the ABA Journal went on to say:

> Currier said that the section gets a lot of information from law schools' annual questionnaires.  "We run all those questionnaires through our magic machine.  All schools that trip triggers or flags are spit out," Currier says.  "It may be that on the basis of professional judgment there is no need to inquire, but there are some things that cause us to say:  'We need to have a conversation with the school.'"

-22-

134.    In none of its accreditation decisions has the ABA ever explained how this "magic machine" was used with respect to Arizona Summit.

### Events Occurring After the Filing of the Complaint

135.    Plaintiffs filed their initial complaint in this action on May 24, 2018

136.    On June 8, 2018, the Council issued to Arizona Summit a decision withdrawing the law school's accreditation based on the Council's conclusion that the law school was not in compliance with Standards 301(a), 309(b) and 501(b) and Interpretations 501-1 and 501-2. The Council did not base its decision on Standard 202(a). The Council's decision stated that Arizona Summit had the right to appeal the decision to the ABA Appeals Panel. The Council's decision also stated that the ABA's withdrawal of Arizona Summit's accreditation would not be effective unless and until the Appeals Panel affirmed the Council's decision. Arizona Summit timely appealed the Council's decision to the Appeals Panel. A copy of Arizona Summit's appeal brief, dated July 16, 2018, is attached as Exhibit 1. The Council's decision is arbitrary and capricious and in violation of due process, including for reasons thoroughly stated in Arizona Summit's appeal brief.

137.    In July 2018, the ABA released a public statement regarding its decision on North Carolina Central University School of Law ("NCCU"). The ABA found NCCU to be in compliance with Standard 501(b) and Interpretation 501-1. The ABA applied to NCCU the same "concrete steps" test that the ABA had applied to Cooley, but not to Arizona Summit. The ABA's June 2018 decision on Arizona Summit is inconsistent with the ABA's July 2018 decision on NCCU and the ABA's April 2018 decision on Cooley.

138.    On July 27, 2018, the ABA moved to stay the proceedings in this case pending the resolution of the Arizona Summit's appeal to the appeals panel. Plaintiffs did not oppose the ABA's motion. The Court subsequently entered orders staying the case. The stay has now expired or been lifted.

139.    On August 1, 2018, the U.S. Judicial Panel on Multidistrict Litigation denied the ABA's motion to transfer this action to the Western District of North Carolina. *See In re: ABA Law Sch. Accreditation Litig.*, MDL No. 2855, 2018 WL 3737979 (J.P.M.L. 2018).

-23-

140.    On August 6, 2018, the ABA eliminated its Accreditation Committee.  Thus, all of the work previously performed by the Committee must now be performed by the Council.  The elimination of the Committee deprives Arizona Summit and other law schools of the benefit of having the ABA's accreditation function and powers separated between two bodies, with one body performing the function of reviewing the work of the other.

141.    On November 1, 2018, the ABA approved Arizona Summit's teach-out plan.  The ABA's decision stated that, as part of the teach-out plan, the ABA will not remove Arizona Summit's accreditation until the conclusion of the Spring 2020 semester.

142.    The ABA required Arizona Summit to withdraw its appeal to the ABA Appeals Panel as a condition of obtaining ABA approval of the teach-out plan.   In compliance with the ABA's requirement and in order to obtain approval of its teach-out plan, Arizona Summit withdrew its appeal to the Appeals Panel on or about November 2, 2018.

## CAUSES OF ACTION

## COUNT I

## (VIOLATION OF DUE PROCESS)

143.    Plaintiffs repeat and reallege the allegations of paragraphs 1-142 as if set forth fully herein.

144.    The ABA in its Decisions committed numerous violations of its obligation to provide due process to Arizona Summit.

145.    Contrary to the HEA and DOE regulations, as well as the federal common law due process obligation that is informed in part by those sources of law, the ABA violated due process in the following respects, among others:  The ABA did not apply to Arizona Summit clear standards for accreditation; did not specify in writing the supposed deficiencies at Arizona Summit; did not consider Arizona Summit's responses regarding the supposed deficiencies before taking adverse action; did not describe the basis for its adverse accrediting actions; did not consistently apply and enforce it standards; and did not employ effective controls against the inconsistent application of its standards.

146.   In concluding that Arizona Summit was not in compliance with Standards 202(a), 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2, the ABA violated the due process required by federal common law.  The ABA's conclusions, adverse findings, and specific remedial actions imposed on Arizona Summit were arbitrary, capricious, unreasonable, an abuse of discretion, not in accordance with law, contrary to constitutional right, without observance of procedure required by law, and not based on substantial evidence.  The ABA failed to provide a reasoned explanation for its decisions, conclusions, adverse findings, and specific remedial actions imposed on Arizona Summit. The ABA's decisions on Arizona Summit were inconsistent with the ABA's decision on another law school.

147.   The Standards articulated by the ABA and applied to Arizona Summit are vague and lack objective tests for assessing compliance.

148.   Contrary to the HEA and DOE regulations, the ABA did not apply to Arizona Summit clear standards for accreditation; did not adequately specify in writing the supposed deficiencies identified at Arizona Summit; and did not describe the basis for its adverse accrediting actions and probation action.

149.   To the extent that one or more DOE officials during the prior Administration coerced, pressured, or significantly encouraged the ABA to take adverse accreditation action against for-profit law schools, including law schools owned by InfiLaw such as Arizona Summit, the ABA's actions violated the Due Process Clause of the Fifth Amendment.

## COUNT II
## (DECLARATORY JUDGMENT)

150.   Plaintiffs repeat and reallege the allegations of the paragraphs 1-142 as if set forth fully herein.

151.   The Declaratory Judgment Act provides:  "In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other

-25-

1    legal relations of any interested party seeking such declaration, whether or not further relief

2    is or could be sought."  28 U.S.C. § 2201(a).

3          152.   In this case, there is an actual and substantial controversy, between parties

4    having adverse legal interests, of sufficient immediacy and reality to warrant the issuance

5    of a declaratory judgment.

6          153.   This Court possesses an independent basis for jurisdiction over the parties.

7          154.   A judgment declaring that the ABA's Decisions regarding Arizona Summit

8    violated due process will serve a useful purpose in clarifying and settling the legal relations

9    in issue and will terminate and afford relief from the uncertainty, insecurity, and controversy

10   giving rise to the proceeding.

11         155.   Absent a declaratory judgment, there is a substantial likelihood that Arizona

12   Summit will suffer irreparable injury in the future.

13                              **<u>PRAYER FOR RELIEF</u>**

14         WHEREFORE, Plaintiffs respectfully request that the Court:

15         (a)    Vacate, hold unlawful, and set aside the ABA's Decisions on Arizona Summit

16   and the ABA's conclusions, adverse findings, and specific remedial actions in those

17   Decisions;

18         (b)    Declare that the ABA's Decisions on Arizona Summit are arbitrary and

19   capricious and otherwise violate due process;

20         (c)    Declare that, contrary to due process and the provisions of the HEA and DOE

21   regulations requiring the ABA to articulate and apply "clear" accreditation standards, ABA

22   Standards 202(a), 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2 are

23   unlawfully vague and, therefore, unenforceable;

24         (d)    Grant an injunction prohibiting the ABA from applying or enforcing its

25   Decisions against Arizona Summit;

26         (e)    Grant an injunction barring the ABA from enforcing Standards 202(a),

27   301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2 against Arizona Summit or

28   any law school;

-26-

1    (f)    Grant an injunction requiring the ABA to adhere to all of the requirements of

2    due process obligations in all future accreditation proceedings;

3    (g)    Enjoin the ABA *pendente lite* from removing Arizona Summit from the list

4    of ABA-approved law schools or otherwise withdrawing or terminating Arizona Summit's

5    accreditation.

6    (h)    Award damages for the ABA's violations of due process; and

7    (i)    Award pre- and post-judgment interest, attorney's fees, and such other and

8    further relief as the Court may deem just and proper.

9    <u>**DEMAND FOR TRIAL BY JURY**</u>

10    Plaintiffs hereby demand trial by jury on all issues so triable.

11    RESPECTFULLY SUBMITTED this 12th day of December, 2018.

12    QUARLES & BRADY LLP
      Renaissance One
13    Two North Central Avenue
      Phoenix, AZ  85004-2391

14

15

16    By   */s/ Nicole France Stanton*
                Nicole France Stanton

17    Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

QB\152522.00017\55276505.1

1

## **CERTIFICATE OF SERVICE**

2

3        I hereby certify that on December 12, 2018, I electronically transmitted the

4   attached document to the Clerk's Office using the CM/ECF System for filing and

5   transmisstal of a Notice of Electronic Filing to all CM/ECF registrants.

6

7                                    /s/ Sandee L. Moore

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

QB\152522.00017\55276505.1