EXHIBIT "1"



July 16, 2018

Barry A. Currier
Managing Director
Section of Legal Education and Admissions to the Bar
321 N. Clark Street
Chicago, IL 60654

**Re:   Appeal of June 08, 2018 Decision of the Council**

Mr. Currier:

Please find attached Arizona Summit Law School's Appeal of the June 8, 2018 Decision of the Council to revoke the School's accreditation. We look forward to hearing from you regarding a date for the hearing on the appeal, as well as a detailed description of the procedures applicable to the hearing.

Please let us know if you have any questions about this submission.

Sincerely,

Penny L. Willrich
Interim Dean

C. Peter Goplerud
Interim President

**APPEAL OF THE ARIZONA SUMMIT LAW SCHOOL**
**To the Appeals Panel of the ABA Section of Legal Education**
**And Admissions to the Bar**

**INTRODUCTION AND**
**EXECUTIVE SUMMARY**

This is an appeal of the final decision by the Council of the Section of Legal Education and Admissions to the Bar to withdraw the accreditation of the Arizona Summit Law School (ASLS, or the School, or the Law School). That decision is arbitrary and capricious in itself and indeed in almost every paragraph. It also rests on an unrelenting record of prior arbitrary and capricious conduct by the Council and the Accreditation Committee. Many of these actions and decisions violate United States Department of Education (ED) regulations and threaten the integrity of the legal education system and the Council's status as a recognized accreditor.

Recent decisions by the Council and the Accreditation Committee have been publicly recognized as arbitrary and capricious. In a recent blog post, David Frakt, one of the harshest critics of ASLS and its affiliated schools, described one form of arbitrary and capricious conduct in connection with another law school:

> I have no problem with the ABA being tough.  But if it is to be tough, it must also be consistent in its approach and transparent in its reasoning.  By imposing tough remedial measures on Florida Coastal, while ignoring other law schools with current and ongoing egregious admission practices (e.g. Charleston and Southern), and by its inconsistent actions toward [Western Michigan University] and other law schools, the ABA appears to be arbitrary and capricious rather than firm but fair, and that is not good for legal education or the profession.[1]

ASLS agrees that it is appropriate for the Council and Committee to be "firm but fair." But that is not how the Council and Committee have acted. Their conduct regarding ASLS and other schools reflects highly problematic attitudes about their power and role. It harms increasing numbers of schools and their students and threatens public confidence in the law school accreditation system.

***The Fundamental Problem***

The heart of the problem lies in a decision-making protocol by which:

- The Council or Committee forms a subjective impression that *something* must be wrong with a school or that *there must be some violation of the Standards, somewhere;*

---

[1] David Frakt, *In Defense of Florida Coastal*, The Faculty Lounge, (May 10, 2018), http://www.thefacultylounge.org/2018/05/in-defense-of-florida-coastal.html.

- The Committee makes a sweeping request for information relating to certain Standards whose language is marked by a lack of clarity or specificity;

- The Committee and Council make highly selective choices from the facts supplied by the school, disregarding or minimizing those that do not support the initial impression and relying on ones that are at best tangentially relevant to the Standards as written;

- The Committee or Council matches these selective facts to novel readings of certain Standards that are not supported by the express language and then implements these novel readings without any proper process or notice to schools;

- The Committee or Council thereby finds the very violation initially assumed be *somewhere* and, in this way, purports to justify the initial impression.

This protocol began to be used in 2015 and has been most significantly applied in connection with the following Standards and Rules:

**Standard 301(a):** A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession.

**Standard 309(b):** A law school shall provide academic support designed to afford students a reasonable opportunity to complete the program of legal education, graduate, and become members of the legal profession.

**Standard 501(b):** A law school shall only admit applicants who appear capable of satisfactorily completing its program of legal education and being admitted to the bar.

**Rule 16(a):** Conduct for which sanctions may be imposed upon a law school includes, without limitation:

> (1) Substantial or persistent noncompliance with one or more of the Standards.

These Standards and Rules rest on key concepts that are hazy and undefined, such as "rigorous program," "reasonable opportunity," and "substantial," or that describe actual knowledge and intent, such as "appear capable." Their haziness and subjectivity enable the Committee and Council to move from an impression that there must be *some Standard* violated somewhere, to a conclusion that it is *this Standard that is violated,* via the novel reading given it.

As will be described in greater length below, the protocol has been applied to ASLS since 2015. Briefly stated:

- In October 2014, the Committee issued a decision letter following the 2013 regular site inspection. That letter expressed no concern that the School might be out of compliance with Standards 301(a), 309(b), or 501(b).

- In mid-2015, the Council and Committee dramatically changed their reading and application of those three Standards in ways not consistent with their express language. Despite the importance of these changes and despite their impact on law schools and the law school accreditation system, neither the Council, Committee, or Managing Director provided any notice of them or any explanation of what the Standards now purportedly required.

- The Committee and Council ignored repeated requests by the School for clarification of what the Committee and Council were requiring of it.

- Throughout the entire period covered by these proceedings, the School was engaged in rapid, substantial, data-driven improvements to its admissions policies and practices, its program of legal education, and its academic support and bar preparation.

- The Committee and Council disregarded the evidence of these improvements and their impact in their decisions regarding the School's compliance with the three Standards.

- Through its new protocol, the Committee and Council:

  o Found violations (including ex post facto violations) of Standards 301(a), 309(b), and 501(b);

  o Then further found, without explanation, that the violations of those same Standards had been "substantial" and "persistent" as justification for imposing probation;

  o Then, disregarding or misstating the record, concluded that there was no reason to extend the period for the School to come into compliance with the Standards;

  o And finally, in the May 2018 Decision Letter, revoked accreditation.

### *Arbitrary and Capricious*

An essential requirement for a decision *not* to be arbitrary and capricious is that the decision be based on a full, unbiased examination of those and only those facts relevant to a

standard. The decision must be based on the facts, rather than on impressions or prejudgment. Another essential requirement is that language of the standard applied have a clear meaning known to the affected school. Otherwise, a school is unable to know what is required of it and what it needs to do to cure any deficiencies. As the Department of Education's Director of the Accreditation Group reminded ABA representatives at the 2016 hearing of the National Advisory Committee on Institutional Quality and Integrity (NACIQI) on reauthorization of the ABA as an accreditor:

> [Y]our policies have to currently reflect what you are doing so that is why you were found out of compliance with those issues, no matter how minor.
>
> We want to make sure that the schools that follow your standards clearly understand what you want them to do.[2]

Despite this warning, and despite the clear requirements of Department of Education regulations, the Council purported to legitimize its new practices as inevitable. Only a few months after the NACIQI hearing, the Council publicly took the position that, in the words of (then) Chair-Elect Maureen O'Rourke, Standards are not rules and "by their nature are fuzzy and hard to enforce." Rather than initiate the established process to revise the Standards to remove the fuzziness, the Council and Committee instead used fuzziness as a justification for imposing their own revisions of the Standards that subordinated the actual language.

The dramatic change in the Committee's and Council's approach, particularly to Standards 301 and 501, was widely recognized as a response to public pressure on the ABA to "do something" about declining first-time bar passage rates nationwide. As then-Council Chair Rebecca Berch described the pressure:

> The allegation has been made that, to fill classes, a few of these schools have admitted applicants who lack the ability to complete a law school education. As proof, critics point to the decline in applicants' LSATs and GPAs during this period as well as to the decline in schools' bar-pass percentages. The call has gone out for "the ABA" to halt this practice and sanction the schools.[3]

Relying on subjective impressions about an undefined "practice" to sanction a school is illegitimate on its face. Relying on first-time bar pass rates and LSAT and UGPA profiles is equally problematic. Such metrics, even if declining, do *not* necessarily point to any Standards violation. To take a key example, Standards 301(a), 309(b), and 501(b) center on graduates being capable of "admission to the bar" or "becom[ing] members of the legal profession"—*not to being admitted to the bar on the first-try*. The reason for not focusing on

---

[2] Transcript of the National Advisory Committee on Institutional Quality and Integrity (NACIQI) Meeting, June 22, 2016 p. 221. http://www.abajournal.com/files/naciqi-transcripts-062216.pdf.

[3] Rebecca White Berch, *Immediate Sanctions for Law Schools That Have Lowered Admissions Criteria? Not so Fast*, 47 Syllabus, no. 2, 2015, at 2. https://www.americanbar.org/publications/syllabus_home/volume-47-2015-2016/syllabus-winter-2015-2016--47-2-/from-the-chair.html.

first-time bar passage was well stated by Managing Director Barry Currier to NACIQI at the 2016 hearing on reauthorization:

> There are many reasons students don't pass the bar exam on the first try and it seems appropriate for the accreditation standards to not look simply at first-time success but to look at ultimate success so that's what we have been doing with the bar pass rates.[4]

Subjective impressions and first-time bar pass rates and LSAT and UGPA scores alone are at best flimsy guides to the issue of compliance with Standards 301(a), 309(b), and 501(b).

The new protocol has affected many schools. This can be seen from the steadily increasing number of schools that have been found out of compliance with Standard 301(a) or 501(b) or placed on probation.[5] Exacerbating the problem is that the recast Standards have been applied inconsistently to different schools similarly situated.[6] Yet, to the extent the ABA's goal was to stem the decline in bar passage rates, the new approach has been a failure. This is plain from the continued nationwide decline of school bar pass rates to this very date.[7]

### *Relief Sought*

We seek immediate relief for ASLS from the Council's decision, specifically:

- Reversal of the withdrawal of accreditation;

- Removal of probation; and

- A determination that the School is in compliance with Standards 301(a), 309(b), and 501(b) or, alternatively, an extension of time under Rule 14(c) to be found in compliance with these Standards.

Through this appeal, we are ultimately requesting the Appeals Panel to help rein in improper and harmful conduct by the Council and Committee. We fully agree with the overall goals of law school accreditation: ensuring quality education, protecting the interests of students, and ensuring public confidence in the system. But the Council and

---

[4] Transcript of the National Advisory Committee on Institutional Quality and Integrity (NACIQI) Meeting, June 22, 2016 p. 179. http://www.abajournal.com/files/naciqi-transcripts-062216.pdf.

[5] At least 13 law schools have been found out-of-compliance with Standards 301, 308 or 501 and subject to Public Notices since August 2016. See ABA News & Announcements and Accreditation Archives at https://www.americanbar.org/groups/legal_education/news_announcements.html.

[6] See pp. 57-58, *infra*.

[7] First-time bar pass rates declined nationally from 82% in 2008 to 69% in 2016. The continuing decline can be seen strikingly in the results of the February 2018 California bar examination. See, Stephanie Francis Ward, *Pass rate for February's California state bar exam drops by more than 7 percentage points*, ABA Journal Daily News (May 21, 2018, 1:35 PM CDT),
http://www.abajournal.com/news/article/pass_rate_for_februarys_california_state_bar_exam_drops.

Committee have chosen to pursue these goals in the wrong way.  And because their arbitrary and capricious methods also contravene Department of Education regulations, particularly those relating to due process, they jeopardize the ABA's status as a recognized accreditor.

This Appeal will proceed as follows. First, we review relevant criteria for application of the "arbitrary and capricious" standard of review. Second, we provide a brief review of the material facts in the record concerning ASLS's actions to improve its program and practices, and the treatment by the Accreditation Committee and Council of these actions and improvements. Third, we carefully review the May 2018 Decision Letter and show that it constitutes, on its face, arbitrary and capricious decision making. That Decision Letter well illustrates many, if not most, of the forms of arbitrary and capricious conduct systematically engaged in by the Council and Committee in prior proceedings. Fourth, we review the Council and Committee actions and decisions over the four-year record of these proceedings and show that they exhibit a vast number and variety of forms of arbitrariness and capriciousness. Finally, we conclude and request specific relief from the Appeals Panel. It is essential that the Appeals Panel itself order the relief, since a simple remand to the Council would be futile in light of the history of its actions set out in this appeal.

## CRITERIA FOR "ARBITRARY AND CAPRICIOUS" REVIEW

The Rules of Procedure prescribe very few guidelines for an appeal to the Appeals Panel. We are unaware of any prior, similar proceedings that might serve as precedent.  One highly significant lack of guidance is in the standard of review set out in Rule 36(c)(1)— "arbitrary and capricious." It is not defined or explained. Thus, we set out below reasonable, common-sense guidelines for review under an arbitrary and capricious standard, that can prevent use of that standard from itself being arbitrary and capricious.

The "arbitrary and capricious" standard of review is amorphous, and so more specificity is needed for it to serve as an effective guide. While "arbitrary and capricious" cannot be reduced to a black-letter statement, it can be clarified in light of the ABA Standards and Rules, common understandings, and the values and principles sought to safeguarded in the particular context—Appeals Panel review—in which it is now to be used.

There are four key considerations that must guide the clarification and use here of arbitrary and capricious review.

*First*, while courts often defer substantially to accreditors because of the courts' lack of expertise, that consideration does not apply here. Rule 35 requires the members of the Appeals Panel to be former members of the Council or Committee, or experienced site inspectors, and be "[e]xperienced in and knowledgeable about the Standards, Interpretations and Rules of Procedure."

*Second*, Rule 1 of the Rules of Procedure expressly states that:

These Rules of Procedure govern the accreditation process as carried out by the Council, Accreditation Committee, Managing Director, and Appeals Panel. They establish processes relating to accreditation that further the purposes of the Standards and promote consistency, fairness, and transparency.

Thus, consistency, fairness, and transparency are central to proper decision making and central to any review of a decision for arbitrariness or capriciousness.

*Third,* as discussed in more detail below,[8] Department of Education regulations governing accreditors set out specific requirements concerning due process and fair treatment, including consistency, transparency, and standards-based decision making.

*Fourth*, the issue here is one of life or death of a school and the inevitable and foreseeable consequences for students and other important constituencies. These high stakes make it even more compelling that the accreditor not "run off the rails" and that the accreditor "play it straight."[9]

These considerations give rise to five central values and principles that are to be safeguarded in, and that should guide the application, of an arbitrary and capricious standard to review of Council and Committee actions and decisions by the Appeals Panel. They are as follows.

The first is *transparency*. In this context transparency requires at least that:

- The governing Rules or Standards clearly articulate in a comprehensible fashion what is required of the person or entity subject to them.

- The Council and Committee apply the Standards and Rules as they are written, not as they might have been written or, in the opinion of the Council or Committee, should be written. Where Standards or Rules are not clear, they should be amended to make them clear or else the Council and Committee should clearly communicate their reading of the language and the justification for that reading.

- The Council and Committee clearly communicate the reasons for a decision as to whether a person or entity in fact complies with the Standards, so that, among other things, a school will know how to comply.

The second value or principle is *consistency*. In this context, consistency requires at least that:

---

[8] Pp. 62-65, *infra.*
[9] *Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools and Colleges,* 781 F.3d 161 (4th Cir. 2015).

- Rules and standards be given a consistent interpretation and application across time.

- Rules and standards be given a consistent interpretation and application across parties.

- The Council and Committee have and use methods for ensuring consistency in decision making regarding Standards and Rules.

The third value or principle is *fairness.* In this context, fairness requires at least that:

- The parties to the proceeding are treated with open-mindedness and respect.

- The Council and Committee not act on the basis of prejudgment (including bias).

- Prior to an adverse decision on a particular ground, affected parties have notice of the ground and an opportunity to respond.

The fourth value or principle is *reasonableness.* In this context, reasonableness requires at least that:

- The Council and Committee base their decisions on all the relevant facts.

- The Council and Committee base their decisions on sound logic.

- Any penalty imposed is reasonably related to purposes.

The fifth principle or value is *alignment* with governing authority. In this context, alignment requires:

- Compliance with the Higher Education Act and Department of Education regulations[10] and other laws governing accreditors.[11]

---

[10] In a recent brief filed in a pending law suit involving another law school, the ABA argues that Department of Education regulations are not applicable standards in litigation by a school against an accreditor. Even if the ABA position were correct it would be irrelevant here. In this case, the decision maker—the Appeals Panel—is a part of the ABA accreditation system. To say that a decision maker within the ABA system may disregard ED regulations in the course of making a decision is to deny the obligation of the ABA to self-regulate its compliance with those regulations. 34 C.F.R §602.18 (b) specifically requires self-regulation, in requiring that an accreditor "[h]as effective controls against the inconsistent application of the agency's standards."

[11] To the extent that one or more Department of Education officials during the prior Administration coerced, pressured, or significantly encouraged the ABA to take adverse accreditation action against a school, the ABA's actions would be subject to the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act.

- Consistency with norms in the system of higher education accreditation, of which the ABA is a part.

## CONTINUOUS IMPROVEMENT AND STANDARDS COMPLIANCE BY ASLS, AND COMMITTEE AND COUNCIL DECISIONS, SINCE 2013

Another element of Appeals Panel procedure that is not defined or delineated by the Rules is the scope of "evidence" and the "record." Rule 36(d) provides that:

> The written appeal and supporting documentation may not contain or refer to any evidence that was not in the record before the Council.

However, the Rule fails to clarify the meaning of "evidence" and fails to specify the scope of the "record." In this Appeal we largely limit the discussion to the site reports and fact-finding reports, ASLS submissions to the Committee and Council, transcripts of hearings, and decision letters. We make limited use of communications between ASLS and the Managing Director's office and publicly available information.

The following is a brief review of what the record shows about ASLS programs and operations and continuous improvement of them, standards compliance, and decisions by the Committee and Council since 2013.

### *The 2013 Site Inspection and Initial Decision Letter*

In 2013, the Section of Legal Education and Admissions to the Bar conducted a regular site inspection of Arizona Summit Law School.  The inspection was comprehensive. It examined and reported all aspects of the School's program of legal education and operations, including admission policies and practices. The site report noted, and the Committee's October 27, 2014 decision letter reiterated the fact, that the School consistently utilized data and analysis to help guide its admissions policies and practices:[12]

> The Law School benefits from the advanced metrics capabilities of the InfiLaw group and has substantial data on the admissions process and success rates of students . . .

The record shows that, in the period 2012-2014, the School was fully in compliance with Standard 316 as to both first-time and ultimate bar pass rates. First-time Arizona bar pass rates were between 7.6 and 10.5 percentage points below the state average[13] and the ultimate bar pass rate for the three bar cohorts was between 78% and 95%.[14]

---

[12] Acc. Comm. Dec. findings ¶52 (Sept. 2014)(received October 27, 2014).

[13] Acc. Comm. Dec. findings ¶(4)(d) (Apr. 2016).

[14] The ASLS Response to the ABA in August 2016 reported 2012 and 2013 pass rates of 95% and 81% at the time. ASLS Rep. 2 (August 2016). In the May 2017 Reliable Plan, the Law School reported a 78% ultimate bar for 2014 graduates. ASLS Reliable Plan p. 31 (May 15, 2017).

Prior to that same period, incoming class LSAT profiles had been declining (as they had been at many other accredited law schools). However, the 25th percentile and median LSAT for incoming cohorts had stabilized by 2012.[15] Because of the prior decline, the decision letter directed the School's attention under Rule 13(b) to the requirements of Standard 501(b). Such a Rule 13(b) "direct attention" presupposed the School met the requirements of the invoked Standard, here 501(b).[16]

In the October 2014 decision letter, the Committee did not conclude that it had reason to believe the School was not in compliance with Standards 301(a), 309(b), or 501(b). Nor did it conclude it had insufficient information to determine compliance with those Standards. The Committee directed the School's attention to Standard 309(b), thus presuming compliance with it. The letter expressed no concerns regarding the School's compliance with Standards 301(a) and did not direct attention to it.

### *The Events of 2015*

The Committee issued a second decision letter in June 2015, following the School's written response to the October 2014 decision letter and the submission of the 2014 Annual Questionnaire. In Conclusion 2(b) of that second letter, the Committee now requested "additional information to enable it to determine the Law School's compliance" with:

> Standards 301(a), 308(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2, with respect to the requirement that a law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar, in that there is a six-point decline in the 25th percentile LSAT score of its first-year class since 2011. [See Finding of Fact (3)(a).][17]

The Committee further specified that the response should include "information demonstrating that [ASLS] does not admit applicants who do not appear capable of satisfactorily completing its program of legal education and admission to the bar," with specific details regarding students below the 25th percentile LSAT and UGPA. It further requested "information regarding the academic support provided" students below these 25th percentiles. There was no specific request regarding the program of legal education.[18]

---

[15] Council Dec. findings ¶(1)(a)(May 2018).
[16] Rule 13(b) provides that:
> In finding a law school in compliance with a Standard, the Committee may couple the finding with a statement calling the law school's attention to the requirements of that Standard when the Committee has reason to believe that the law school might, at some time before the next scheduled site evaluation, no longer be in compliance with the Standard in question.
[17] Acc. Comm. Dec. Concl. ¶ 2(b) (June 2015).
[18] Acc. Comm. Dec. Req. ¶ 3(b) (June 2015).

The sole finding of fact to support this conclusion and request—a decline in 25th percentile LSAT—consisted of information substantially known at the time of the 2014 decision letter.

The School found Conclusion 2(b) to be surprising and confusing. It provided no useful guidance for a response, since:

- The Committee had not questioned compliance with any of these Standards in the October 2014 decision letter, in which the facts before the Committee were substantially the same.

- Nothing was cited to contradict the earlier finding that the Law School's admissions process relied on data about admitted students and their success rates. The evidence unequivocally showed that students with a 141-143 LSAT historically passed the bar exam at a 67% rate "so it was reasonable for us at that time to presume that those students had the capability and the ability to be able to be successful in law school and beyond."[19] And prior to 2015, 82% of ASLS AAMPLE[20] students had passed a bar examination.[21]

- The Committee did not cite any findings of fact relating to the program of legal education to justify any concern with Standard 301(a). The School was in compliance with the bar passage metrics of Standard 316. But Standard 316(a) expressly states that "a law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates" that one of the metrics in Standard 316 is met. This sufficiency relates to the requirement of Standard 301(a) that the program of legal education prepare students for admission to the bar. As to the requirement in 301(a) that the program be "rigorous," *there was no finding to show or even suggest lack of rigor*. The Committee never explained what relevance an admissions metric (25th percentile LSAT) might have to the issue of the rigor of the program.

- The Committee's extensive reliance on 25th percentile LSAT score appeared to require disregard the provisions of the LSAT Cautionary Policies concerning LSAT Scores, which is included as an appendix to the compilation of ABA Standards and Rules. Those provisions include the following:
    - [W]hile LSAT scores serve a useful purpose in the admission process, they do not measure, nor are they intended to measure, all the elements important to success at individual institutions. LSAT scores must be

---

[19] See testimony of Dean Shirley Mays, Acc. Comm. Hr'g Oct. 28, 2016, Tr. 15:13-15.
[20] AAMPLE is a conditional admissions program for applicants with low entrance indicators (typically below 144). Admission through AAMPLE required at least a 2.50 grade in two law-school like courses. AAMPLE had a 35-year history at other schools, including Nova Southeastern, New York Law School, and Florida Coastal School of Law, and had been proven effective. See ASLS Resp. 23 (August 2015).
[21] ASLS Resp. 66 (August 2015).

  examined in relation to the total range of information available about a
  prospective law student.

  o The LSAT should be used as only one of several criteria for evaluation and
   should not be given undue weight solely because its use is convenient.

  o Cut-off LSAT scores (those below which no applicants will be considered)
   are strongly discouraged. Such boundaries should be used only if the choice
   of a particular cut-off is based on a carefully considered and formulated
   rationale that is supported by empirical data, for example, one based on
   clear evidence that those scoring below the cut-off have substantial difficulty
   doing satisfactory law school work.

  o Significantly, cut-off scores may have a greater adverse impact upon
   applicants from minority groups than upon the general applicant
   population.

  o The LSAT was designed to serve admission functions only. It has not been
   validated for any other purpose.

- The Committee gave no guidance as to how the new 25th percentile LSAT metric
  was to be reconciled with the requirement found in the plain language of Standards
  301(a), 205, and 206, to respect the School's mission of providing opportunity to
  underserved populations.

Despite the School's inability to understand the rationale for the sweeping request for
information, the School trusted the bona fides of the Committee and trusted that it would
be fair, transparent and reasonable. The School assembled the requested information and
submitted it. The School also examined how it could make improvements regarding the
express subjects of the three Standards.

### *The July 2015 Bar Examination and Subsequent Improvements*

Following the June 2015 decision letter, the School sustained an unexpected, significant
decline in first-time Arizona bar passage on the July 2015 bar exam. The July 2015 first-
time passage rate fell to 35.2 percentage points below the state average. [22] The School
received notice of these results in October 2015, after the 2015 entering cohort had
matriculated. Thus, any changes in admission policies and practices would have to wait
until 2016.

Until this time, the School's predictive model used for admissions and bar passage had been
successful. Until this unexpected decline, the model indicated that even students with
lower entering credentials would ultimately be successful on a bar examination. [23] The

---

[22] July 2015 bar results for the state of Arizona are available at:
https://www.azcourts.gov/Portals/26/admis/Stats/Exam%20results.pdf.

[23] ASLS Resp. 66, 68  (Aug. 8, 2016). *See also* Testimony of Adam Cota as justification for the admissions
decisions in 2012-2016 "[t]he AAMPLE pass rate at that time was very high...much higher than would have

School could not immediately determine whether the July 2015 results were an anomaly or a signal that the model no longer worked because of changed circumstances. Nonetheless, the School began to re-analyze its data and implement significant improvements to admissions policies and practices, the program of education, and academic support. Among many others noted in the record, these improvements included:

- Using the most recent data on admissions and student performance to recalibrate admissions policy and standards. The recalibration was designed to ensure that, in light of the July 2015 bar results, the School would continue, as it had before, to satisfy the requirement of Standard 501(b) that the School admit only "applicants who appear capable of satisfactorily completing its program of legal education and being admitted to the bar."[24]

- The School's improvements in admissions policy and standards were implemented beginning in May 2016, once it became clear from the February 2016 bar results that the July 2015 results were not an anomaly. This led to steady increases in median and 25th percentile LSAT. As of the date of the Council's May 2018 Decision Letter, the 25th percentile and median LSAT had increased to 146 and 149, respectively.[25] Indeed, the improvements in 25th percentile and median LSAT between 2016 and 2017 were *the largest of any ABA accredited law school in the nation.*[26]

- The School reduced its reliance on, and then ceased to use, the AAMPLE alternative admission program, through which applicants with LSATs below 140 had been admitted based on performance on law-school like exams. Review of the most recent data showed that successful completion of the program was no longer reliably predictive of law school and bar success. By this time AAMPLE students had come to constitute nearly all of the 25th percentile LSAT admitted cohorts,[27] and so elimination of the AAMPLE eliminated the then-25th percentile LSAT and automatically raised it.

- The School increased its LGPA requirement for academic good standing from 2.0 to 2.2, so that students now deemed at risk (but who, at admission, had been judged capable of completing their education and being admitted to the bar) would be

---

been presumed by just LSAT scores alone...back in 2012, the AAMPLE [first time] pass rates were above 50 percent." Acc. Comm. Hr'g, March 11, 2017, Tr. 23:8-14.

[24] ASLS Resp. 63, 76 (Aug. 2016) See also ABA Council Hr'g., Oct. 28, 2016, Tr. 80-82; Acc. Comm. Rec. findings ¶13 (Oct. 2016).

[25] Acc. Comm. Recommendation, findings ¶ 19 (September 2017).

[26] In addition to having the largest increase, the School's 25th percentile and median LSAT for the 2017 entering cohort was greater than or equal to that of 36 other law schools. ASLS Resp. at 5 (Feb. 5, 2018); based on ABA Standard 509, data for 2017 publicly available at:
http://www.abarequireddisclosures.org/Disclosure509.aspx.

[27] Acc. Comm. Hr'g October 28, 2016 , Tr. 28:11-29:20.

saved from two more years of additional debt and would be able to pursue other career paths.

- The School returned to its pre-2013 program of education, greatly emphasizing academic and bar passage competencies and less so practice skills. This included a return to required bar-tested subjects in the 2L and 3L years and changes in how courses were taught. Specifically, all bar-tested courses were required to include bar-style assessments.[28]

The School submitted extensive data and information on these and other improvements and on student performance to the Committee in response to the June 2015 decision letter. The School continued to provide further information and data in every subsequent submission to the Committee and Council.

### *The 2016 Committee Decision Letters and the 2017 Council Decision Letter*

The Committee issued its next decision letter in April 2016. In it, the Committee for the first time held the School out of compliance with Standards 301(a), 309(b), and 501(b). In doing so, the Committee indifferently cited as justifying all of these of these conclusions of non-compliance "Findings of Fact (4) and (8)-(17)."[29] However:

- Findings 10-16 described improvements in the program of legal education, rigor, academic support, and bar preparation. *No findings were made or cited in the letter that showed a lack of rigorous program of legal education or lack of "academic support designed to afford students a reasonable opportunity to complete the program of legal education, graduate, and become members of the legal profession."*

- The School was in compliance with Standard 316(a), regarding ultimate bar passage. Thus, the School met the requirement of 301(a) and so bar passage was sufficient "for purposes of Standard 301(a)," specifically the requirement that the School's program "prepares its students, upon graduation, for admission to the bar."

- The admissions criteria and standards used by the School for the 2016 entering class were substantially the same as those used in 2012-2013, which the Committee had not questioned in its October 2014 decision letter.[30] The Committee failed to provide any reasoned articulation of how the School could suddenly no longer be deemed to comply with Standard 501(b).

---

[28] See, e.g. ASLS ABA Resp., August 8, 2016, p. 53.
[29] Acc. Comm. Dec. Concl. ¶ 1(a)(Apr. 2016).
[30] Council Dec., Discussion ¶(1)(a) (May 2018).

- The Committee's evaluation of the School's admissions practices focused on the 25th percentile LSAT and UGPA, as opposed to historical admissions decision making.

- The Committee failed to provide any guidance to the School as to how to come into compliance with the Standards as the Committee was now reading them.

The Committee issued its next decision letter, following a hearing, in October 2016. The purpose of the hearing and Committee consideration was to further evaluate the School's compliance with Standards 301(1), 309(b), 501(b), and other Standards, and whether to impose sanctions. In that decision letter, the Committee reaffirmed its prior conclusions of non-compliance. But it now also concluded that:

> [T]he issues of non-compliance with Standards 301(a), 308(a), 309(b), and 501(b) are substantial and have been persistent. [31]

On this basis, it recommended to the Council that it impose the sanction of probation.

In making this conclusion and recommendation:

- The Committee said only that "the issues of non-compliance" have been substantial and persistent. But whether "issues" have been substantial or persistent is irrelevant to Rule 16 and is not a basis for imposing sanctions.

- The conclusion about "issues" failed to cite any facts to substantiate the contention that non-compliance—or even "issues of non-compliance"— had been substantial or persistent.

- The Committee failed to provide criteria for what would constitute "substantial" or "persistent" to justify its conclusion.

- The School had first been found out of compliance with Standards 301(a), 309(b), and 501(b) in April 2016, only six months before the October decision letter.
- The Committee disregarded the fact that it had never questioned the School's admissions process or its compliance with Standards 301(a), 309(b), and 501(b) following the site inspection in 2013 and through at least mid-2015

As to the recommendation of probation, the Committee:

- Failed to justify probation as opposed to a lesser sanction, for example one that had recently been imposed on other schools found out of compliance.

---

[31] Acc. Comm. Rec. ¶3 (Oct. 2016).

- The Committee ignored the express requirement of Rule 16(e), that "[t]he Committee will consider aggravating and mitigating circumstances in determining the appropriate sanction." Those mitigating circumstances include "absence of a prior history of violations" and "timely good faith effort to rectify consequences of violation."

The remedial relief ordered by the Committee included the development and submission of a reliable plan to bring the School into compliance with the Standards and the appointment of "a fact-finder to visit the Law School to review the admissions data and admissions methodology provided by the Law School, as well as the overall rigor of the program of legal education."[32]

In March 2017, the Council, following a hearing upon the Committee's decision and recommendation, issued a decision letter. The Council made no new findings of fact and affirmed the conclusions of non-compliance. The Council adopted the Committee's conclusion that "issues of non-compliance" were substantial and persistent, and adopted the recommendation of probation. The Council, like the Committee, directed the School to prepare and submit a reliable plan and directed the Managing Director to appoint a fact finder.

 The Council also concluded that the "plans for the school to bring itself into compliance with the Standards have not been demonstrated to be effective."[33] However, the Council did not explain the relevance of this conclusion to any Standard or Rule. Nor did it explain what plans it was referring to, as the Reliable Plan was not due until May 15, 2017—after the date of the decision letter. Nor did the Council cite any facts to substantiate the conclusion that whatever plans it was referring to had not been shown to be effective.

### _The Requests for Clarification_

Once the School recognized that the Committee and Council were imposing requirements beyond the language of the Standards, it began asking for clarification of _what was now required to come into compliance._ For example, at the October 28, 2016 hearing before the Committee, the School stated that:

> [W]e're not clear at this point in time what it is that the Committee finds lacking.
>
>    . . .

---

[32] Council Dec., Conc. ¶ 4(g) (March 2017).
[33] Council Dec., Conc. ¶ (2) (March 2017).

B]ecause we believe that we, in fact, have satisfied the standards, we greatly appreciate any guidance you would have for us going forward.  If the changes that we haven't made already serve -- prove not to be satisfactory, then it would be particularly helpful if you could identify for us specifically what we should do.[34]

Similarly, in the February 17, 2017 Update Report to the Council, the School stated that:

Although the decision letter of December 06, 2016 did not specify with [particularity], what Summit must do to bring itself into compliance . . .

Summit ... is prepared to make any additional changes the Council deems necessary to maintain Summit's approval by and good standing with the ABA.[35]

And again, in the March 12, 2017 Council hearing, the School expressed its "hope that you will also provide guidance to Summit as we go forward."[36]

And then again, at the September 14, 2017 hearing before the Committee, the School stated that:

[P]erpetuation of probation without more specific direction and guidance from the Section regarding steps we should take, harms our current students, harms our alums, harms the integrity of Summit's program of legal education, and has created roadblocks to diversification of the legal profession.[37]

Neither the Council nor the Committee ever acknowledged, let alone responded to, any of these requests for clarification.

### *Probation*

The School timely submitted its reliable plan to the Committee on May 15, 2017. It complied with the other prescriptions of remedial relief by:

- Notifying all students and alumni of probation within the time required.

- Publishing Appendix A to the decision letter on the School website within the time required.

---

[34] Acc. Comm. Hr'g., Tr. 12:24 and 15:17-23.
[35] ASLS Rep., at 2-3 (Feb 21, 2017).
[36] Council Hr'g., Mar. 11, 2017, Tr.9:15-16.
[37] Council Hr'g., Mar. 11, 2017, Tr.9:15-16.

- Publishing charts of first time bar exam past rates over six administrations and class rank to students as required by the decision, similar in nature to disclosures it had already been making since August 2016.

- Providing the Committee with all admissions data and methodology for the spring, summer, and fall 2017 classes, on or about May 15, 2017.

- Fully cooperating with the fact finders sent pursuant to the decision, including providing all information requested.

### *The Reliable Plan and Fact-Finding Visit*

The School's Reliable Plan comprehensively addressed all of the matters that the Committee and Council required to be addressed. The School vigorously implemented any of the initiatives and improvements that had not already been implemented. The School put in place process for monitoring implementation and progress, and collecting data to aid both monitoring and making further progress. As the dean stated at the Septmber 14, 2017 Accreditation Committee hearing:

> [O]ur reliable plan team meets weekly.  And so the reliable plan team consists of approximately six persons, faculty and some administrators, and we are going through the reliable plan to ensure that everyone is on the same page, everyone is doing what we have indicated that we're doing, and then we are  then gathering data.[38]

The fact-finding visit took place on July 9-11, 2017. In advance of, during, and after the visit, the School provided substantial information and data to the fact finders.

To assist the fact finders, the School prepared what it called Implementation Charts to document the specific actions in the Reliable Plan, the area of non-compliance to which the actions were addressed, and documentation of the reliability of each action. The charts were included as Appendix A to the Fact-Finding Report.[39]

### *The September 2017 Committee Decision*

Following a hearing before the Committee on September 14, 2017, to review the School's progress with regard to Standards 301(a), 309(b), and 501(b), the Committee issued a

---

[38] Acc. Comm. Hr'g., Sep. 14, 2017, Tr. 45:13-18.
[39] Fact Finder Rep. App. A (July 9-11, 2017).

decision letter. The letter relied substantially on the Fact-Finding Report dated August 7, 2017.

In its decision letter, the Committee described the following, which showed both improvement to date and the likelihood of continued improvement:

- The 25th percentile and median LSAT for fall 2017 matriculants were 146 and 149, increases of 5 and 4 points respectively from the prior academic year. Moreover, these increases were consistent with (and even slightly above) the projections for 2017 under the School's predictive model.[40]

- The School had implemented more rigorous criteria and processes to govern its admissions decisions.[41]

- As reported in the Fact-Finding Report, the School was implementing improvements relating to increasing program rigor and preparation for the bar examination, and that, in the words of the Report:

  The Law School is beginning to see some results from the changes in the academic program and academic standards described in the Reliable Plan.[42]

- The Law School had made changes to its curriculum to substantially return it to the structure it had before 2013. The School also increased the required writing courses, increased the number of assessments in courses, and made other improvements.[43]

- The decision letter specifically recognized (quoting the Fact-Finding Report) that:

  The Law School performed a data analysis of its graduates who matriculated with LSAT scores of 144 to 146 from 2007 to 2011, when its 25th and 50th percentile LSAT scores were similar to the Law School's new admission target scores. These students graduated in 2010 to 2015. This analysis may be useful in predicting future bar passage rates when the entering class LSAT scores and UGPAs are similar to those the Law School maintained in admissions from 2007 to 2011.

---

[40] Acc. Comm. Rec. , findings ¶¶ 18-19 (Sep. 2017)(Received by Law School Oct. 3, 2017).
[41] Acc. Comm. Rec., findings  ¶ 21 (Sep. 2017).
[42] Acc. Comm. Rec., findings  ¶ 32 (Sep. 2017).
[43] Acc. Comm. Rec. findings  ¶ 27 (Sep. 2017).

The "LSAT scores and UGPAs" at this time were already similar to those from 2007-2011.

- The decision letter, citing the Fact-Finding Report, notes that the School's 28.6% first-time pass rate for the February 2017 Arizona bar examination was:

  > [A]pproximately 5 percentage points higher than the Law School's first-time bar pass rate for July 2016, even as the overall Arizona first-time pass rate fell by approximately 11 percentage points from July 2016 to February 2017.

Notwithstanding these uncontroverted findings, the Committee concluded that the School had not demonstrated compliance with Standards 301(a), 309(b), and 501(b). To justify these conclusions, the letter sweepingly cited "Findings of Fact (17)- (26) and (28)- (40)." As a result, the School continued to have no insight into what the Committee and Council were requiring for compliance with those Standards.

Despite the stated purpose of the decision letter and antecedent hearing to "monitor[] the law school's compliance with the requirements for remedial action and probation,"[44] the Committee neither approved nor disapproved the Reliable Plan nor provided any critique of it. Nor did the Committee make any findings or conclusions regarding the School's compliance with the terms of probation. The Committee also (by its silence) ignored the School's request and declined to recommend a removal of probation. It also ignored the School's pending request for an extension of time to come into compliance with the relevant Standards.[45] The Committee simply concluded that the "Law School remain on probation and continue the specific remedial actions mandated by the Council in its March 2017 letter."

## THE MAY 2018 DECISION LETTER

This appeal is not just about a single decision by the Council that is arbitrary and capricious in a single respect. It is about a persistent course of decisions and actions by the Council and Committee that are arbitrary and capricious in a panoply of respects. The decisions and actions are contrary to Rule 1's concern that the accreditation processes exemplify "consistency, fairness, and transparency;" contrary to the basic principles and requirements for non-arbitrary and non-capricious decision making; and contrary to governing law. Many, if not most, of these forms of decision and action are found in the Council's May 2018 Decision Letter. Indeed, as we shall see, *nearly every paragraph of that letter contains some form of inconsistency, unfairness, non-transparency, or other*

---

[44] Acc. Comm. Hr'g., Sep. 14, 2017, Tr. 4:22-24.
[45] Acc. Comm. Hr'g., Sep. 14, 2017, Tr. 92:1-6.

*transgression of the norms of due process and proper decision making.* There is more than sufficient basis for invalidating the Council's withdrawal of accreditation.

We address the key findings and assertions of the letter point by point.

### *Introductory Discussion*

***P. 2.*** *The School's May 18, 2018 Submission does not comply with Rule 24(d)(4), which requires that new evidence must be submitted at least 14 days in advance of the Council meeting.*

> The evidence in question was submitted immediately following the hearing and *in response to requests at the hearing by Council members for the very information now said to be barred.*[46] Rule 24(c) and 24(d)(4) cannot sensibly be read to govern requests by the Council for information at the hearing itself.

***P. 2.*** *The May 18, 2018 Submission contains information that appears to be unsupported and does not comply with the requirement of Rule 24(d)(5) that new evidence be appropriately verified at the time of submission.*

> As just explained, Rule 24(d)(5) applies only to evidence submitted before the hearing and governed by Rule 24(c). It does not apply to evidence submitted in response to a request by the Council at the hearing.

> Furthermore, Rule 24(d)(5) does not specify what is required for evidence to be "verified at the time of submission," and the May 2018 Decision Letter does not explain why the Council views the evidence as not meeting that requirement. This is an example of the application of imprecise adjectives without any attempt at precision or justification. And it is another failure of the Council and Committee to provide the School with notice and an opportunity to respond to a novel application of a Standard or Rule.

> Finally, Rule 24(d)(5) nowhere requires that evidence be "supported," whatever that means. There is no requirement of "support" in the Rule. In any event, the Decision Letter does not explain why Council believed that the evidence fails to satisfy this new addition to the Rules despite the fact that the May 18, 2018 Submission clearly cites the basis for most of the updates including "statistical

---

[46] Law School representatives stated multiple times in the hearing that they would submit a supplemental response to questions "probably no later than next week". For instance, Dean Willrich informed Vice Chair Bosse that "[w]e were waiting on our bar results in order to provide that update to the Council. Our bar results come out tomorrow. And so probably no later than next week, we'll have an update to the Committee and the Council." Vice Chair Bosse responded ,"[a]ll right. Thank you." At no point did the Council suggest that an update sent within a week in response to questions would be rejected. See ABA Council May 10, 2018, Tr. 31:14-24.

models (binary logistic regression) and factoring in UGPA, LSAT and non-transfer attrition." These statistical methods are well-established in legal education.

### *What the Council "in particular notes": Admissions*

*¶ 1(a).  From 2012 through the end of 2016, the Law School consistently admitted students with a 25th percentile LSAT of 140-141 and undergraduate GPA from 2.51 to 2.56. [September Recommendation Letter, Finding of Fact (18).]*

Standard 501(b), by it plain language, establishes a requirement governing a school's *process of making individual admissions decisions.* Specifically, it requires a school to "only admit applicants who appear capable of satisfactorily completing its program of legal education and being admitted to the bar." To evaluate compliance with Standard 501(b) requires examination of actual admissions decisions and practice. Thus, for LSAT and UGPA data to be relevant, they must be connected to data about student success that are known or that should be known to a school. LSAT or UGPA group data in a vacuum, unattached to student success data, is irrelevant to the plain language of Standard 501(b).

To make this essential point even clearer, a law school that admits students with "low" LGPA and UGPA indicators can logically fit one of only three scenarios concerning compliance with Standard 501(b):

    (a) The school admitted students with "low" LSAT and UGPA indicators and **lacked any data** or other evidence at the time of admission indicating the capability of such students to succeed;

    (b) The Law School admitted students with "low" LSAT and UGPA indicators despite **having data** or other evidence at the time of admission which shows that such students were **incapable of success; or**

    (c) The school admitted students with "low" LSAT and UGPA indicators consistent with data and other evidence showing that such students **were capable of success.**

The first two scenarios would support a finding of non-compliance with Standard 501(b). The third scenario, by the plain language of Standard 501(b), cannot. And the record clearly shows that, throughout the period cited by the Council, *the Law School had substantial evidence of student success supporting its admissions decisions.* As the School explained to the Council in its May 18 submission:

> ASLS disputes the relevance of admitting students with LSAT or 140 or below and from 141-43, insofar as (1) historically students in these categories eventually passed the bar at a rate greater than 70%; (2) nearly all of the students in the bottom quartile during this period were admitted through AAMPLE and (3) the AAMPLE program had substantial data and history which indicated these students would be "capable of success." The School should not be penalized for relying upon past performance that was

consistent with the requirements of the Standards, nor for the turnaround time needed to reap the benefits of change.[47]

Beyond this key point, paragraph 1(a) merits further comment, as it illustrates two recurring forms of arbitrary and capricious conduct by the Council and Committee.

*First*, the plain language of Standard 501(b) does not establish any metric for compliance, let alone one based on LSAT or UGPA. The Council and Committee have consistently ignored the express language of Standard 501(b), consistently ignored LSAC guidance as to how the LSAT is to be used, and purported to impose numerical or other requirements not found in the language.[48]

True, Interpretations 501-1 and 501-2 permit consideration of admission test scores and UGPA for purposes of assessing compliance with Standard 501. But, as explained above, this does not sanction use of LSAT or UGPA *in a vacuum* for purposes of assessing compliance with Standard 501(b). LSAT and UGPA data must be used in connection with student success data to assess whether individual admissions are being made consistent with the plain language of the Standard.

Indeed, a recent report of the Standards Review Committee, forwarding proposed amendments to Standard 501 and its Interpretations, stated (consistent with the LSAC Guidelines quoted above) that:

> [A] minimum score cannot even be prescribed by the Accreditation Committee when requiring remedial action by a law school to correct problems.[49]

The *second* form of recurring arbitrary and capricious conduct reflected in this paragraph relates to the Council's and Committee's penchant for prejudgment. Standard 501(a) establishes requirements concerning the process of making individual admissions decisions and requires examination of actual practice. The Council and Committee have persistently ignored the facts relating to admissions decision making and short-circuited the Standard 501(b) inquiry.

The School's admissions practices for 2013-2014 were described in detail in the 2014 site evaluation report and reviewed in the Committee's October 27, 2014 Decision Letter. In Finding of Fact ¶ 52 of that letter, the Committee specifically found that:

---

[47] ASLS Supplemental Submission Council submitted May 18, 2018, at. 3.

[48] Furthermore, these requirements have never been disclosed to us, despite our repeated requests.

[49] https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/council_reports_and_resolutions/20171117_notice_and_comment.authcheckdam.pdf.

> The Law School benefits from the advanced metrics capabilities of the
> InfiLaw group and has substantial data on the admissions process and
> success rates of students . . . .

In addition, the Law School's August 8, 2016 Response to the Accreditation
Committee states: "it must be noted that at the time these cohorts matriculated,
statistical models and projections suggested these cohorts would achieve success;"[50]
and provides a detailed explanation in support of that statement in the Appendix.
The Law School explained why such projections may have missed their mark,
including a significant increase in transfer attrition at that time which would have
accounted for a 12-17% decrease in first-time and ultimate bar pass rates.[51] *But
hindsight that takes into account information that was not reasonably known at the
time of decision making cannot be used to show that reliance on a model was
unjustified at the time it was used.*

Moreover, the record shows that when the School's bar pass results unexpectedly
began changing, beginning with the July 2015 exam, *it revised its predictive models in
light of the new data and put in place new admissions guidelines and practices to
ensure that the School would continue to admit only those who appeared capable of
completing their education and being admitted to the bar.* The Council and
Committee have disregarded this evidence and ignored what it shows about the
School's continued good faith compliance with Standard 501(b).

Here, as in so many other instances in the record, the Council and Committee have
relied on impressions and prejudgment, rather than examining or even gathering
the relevant facts. The Council's entrenched prejudgments about non-compliance
with Standard 501(b) are reflected in the October 2016 public statement of Council
Chair Maureen O'Rourke, that:

> Some would say that we as a council are not doing our jobs with respect to
> policing law schools, and there are some schools that are taking in students
> they know will have very little possibility of passing the bar and being
> admitted into the profession. They're accumulating large amounts of debt
> that they have no way to pay back.[52]

It is pure prejudgment, and pure speculation about the knowledge, good faith, and
intent of schools in their admissions decisions to state, without more, that "[s]ome

---

[50] See ASLS Resp., at 14, (Aug. 8, 2016).
[51] The Law School noted that "40% of ASLS students who have a 3.0 LGPA or better transfer to other law
schools" with transfers from ASLS accounting for "15-20% of [Arizona State University's] graduating class"
See ASLS Resp., at 14-15 (Aug. 8, 2016).
[52] Stephanie Francis Ward, Legal Ed Council Approves Proposed Standard for Bar Passage Rates Amid
Diversity Concernts, ABA Journal Daily News (Oct. 21, 2016 3:05 PM CDT).
http://www.abajournal.com/news/article/legal_ed_council_approves_proposed_standard_for_bar_passage_r
ates_amidst_di/.

would say" there are schools admitting students "they know will have very little possibility of passing the bar."

**¶ 1(b)** *After the Committee found the Law School out of compliance with Standards 301(a) and 501(b) and Interpretations 501-1 and 501-2 and directed the School to return to compliance, the Law School matriculated 85 students in fall 2016, more than half of whom would not meet the admissions guidelines the Law School presented to the Committee in its May 15, 2017 Reliable Plan. Twenty-four of the 85 students had an LSAT of 140 or below and 17 had an LSAT of 141-143. [September Recommendation Letter, Finding of Fact (24).]*

To begin, paragraph 1(b) disingenuously confuses *admission decisions* with *matriculation* and disingenuously confuses the *very different dates of these events.* For the 24 matriculants with LSAT of 140 or below, *just 1 one applied and was admitted after May 18, 2016.* And *none* of the matriculants with an LSAT of 141-143 was admitted after May 18. It is clear from the record that the School acted immediately and aggressively to implement the Reliable Plan guidelines and respond to the Committee finding of non-compliance.[53]

Equally disingenuous is the treatment of admissions guidelines set out in the Reliable Plan as determinative of compliance with Standard 501(b). They are not. Compliance cannot possibly be measured by numerical targets in a school-specific reliable plan that were set by the Law School and never approved or disapproved by the Committee or Council. That would make a school the arbiter of its own compliance with Standard 501(b).

In this case, the Reliable Plan metrics were deliberately set to *exceed* what the School believed were reasonable requirements of Standards 501 and 316. They were set so that: (1) no student admitted had less than a 50% chance of graduating and passing the bar exam, thus meeting or exceeding a reasonable reading of Standard 501; and (2) each admitted cohort would exceed the requirements of Standard 316. As discussed below, the metrics so as to meet these targets.

The May 18, 2018 Submission makes clear a critical point that the School made to the Council:

> ASLS has not accepted a single application received after August 20, 2016 with <50% predicted chance of graduating AND passing the bar – this has been the case for almost 2 years.[54]

---

[53] The Committee's October 3, 2017 Decision Letter (¶ 24) contains precisely the same confusion, Acc. Comm. Rec., findings ¶24 (Sep. 2017), as does the Fact Finder Report from which the data in 1(b) is taken. Fact Finder Rep. ¶A(4) at 6 (July 9-11, 2017).

[54] Supplemental Submission to the Council, ASLS Rep. 1-2 (May 18, 2018).

The following chart was submitted to reflect this data: [55]

## ASLS acceptance rates by level of student ability and predicted success
## Applications received after August 20, 2016

| Category | Probability: Graduate + Pass Bar | Number of applications | Number accepted | % accepted |
|---|---|---|---|---|
| Capable but unlikely to graduate and pass the bar exam | <25% | 61 | 0 | 0% |
| Capable of graduating and passing the bar exam | 25-50% | 215 | 0 | 0% |
| Capable and likely to graduate and pass the bar exam | 50-55% | 44 | 4 | 9% |
| | 55-60% | 51 | 20 | 39% |
| | 60-65% | 77 | 55 | 71% |
| | 65-70% | 65 | 55 | 85% |
| | 70-75% | 72 | 58 | 81% |
| Capable and very likely to graduate and pass the bar exam | 75-80% | 71 | 66 | 93% |
| | 80-85% | 64 | 54 | 84% |
| | 85-90% | 45 | 38 | 84% |
| | >90% | 13 | 10 | 77% |
| All applicants | | 778 | 360 | 46% |

The May 18, 2018 submission further reports that "predicted pass rates for students admitted since August 20, 2016" include a 50% first-time pass rate and 86% ultimate bar pass rates excluding non-persisters (well-above the 75% requirement)."[56]

Like much other evidence supplied to the Committee and Council, this evidence— *which, in fact, is probably the most direct measure of whether our admitted students "appear capable"*—is simply ignored by the Council.

The upshot is that paragraph 1(b) consists of a misleading selection of data from the record and a distorted reading of it, and does not remotely show non-compliance with Standard 501(b).

---

[55] The vagueness of Standard 501 is a barrier to determining whether a 50% predicted chance of graduating and passing the bar exam meets or exceeds the language in Standard 501(b). A 50% chance means these students are both "capable and *likely*" to graduate and pass a bar exam, while the plain language of Standard 501(b) only requires that admitted students be "capable of" graduating and passing the bar exam. In any event, it is clear that a 50% predicted rate of graduating and passing the bar exam, at a minimum, meets the requirements of the Standard.

[56] Supplemental Submission to the Council,  ASLS Rep. 1-2 (May 18, 2018).

*¶ 1(c) Although the Law School's Associate Dean reported that the Law School had fully implemented a new admissions rubric starting February 1, 2017, seven of the Law School's 24 Spring and Summer 2017 entering students did not meet the new admissions rubric. [September Recommendation Letter, Findings of Fact (21)-(24).] The Law School's May 18, 2018 Submission states that the admissions "rubric had not been implemented at the time these students were admitted." [May 18, 2018 Submission at p. 3] This does not change the fact that seven of the 24 matriculants in the Spring and Summer 2017 classes did not qualify for admission under the new admissions rubric*

The basic response to this paragraph is the same as the response to ¶ 1(b): compliance with Standard 501(a) is not determined by a school's meeting targets of its Reliable Plan; those targets were chosen to exceed the Council's and Committee's metrics for Standard 501(b); the School immediately and aggressively implemented the targets; and the Council disingenuously confuses matriculation with admission and the respective dates of the two.

It is also significant that paragraphs 1(a)-1(c) of the Decision Letter fail to mention that *the 25th percentile LSAT increased from 140-141 in years prior to 2016 to a 146 in Fall 2017*. Median LSAT similarly increased from 143-144 in years prior 2016 to a 149 in fall 2017.[57] *These improvements in median and 25th percentile LSAT between 2016 and 2017 were larger than for any other ABA accredited law school in the country.*[58]

And as the evidence in the record clearly shows, this large increase matters for bar passage. For example, earlier testimony about the predictive model was given by the Law School's expert, Vice-President Cota:

As the median LSAT increases, the pass rate for those individuals would increase. . . . When we're looking at the current model, we're looking at the median cohorts, and there you see a very strong statistical correlation. So that's one data point.

Second data point is the experience that you all have knowing that if you increase your LSATs by six points, you will see a significant increase in performance.

And third, if you actually benchmark it against other law schools that have a median LSAT of a 146-147, you will also see pass rates in that - in that general range.

---

[57] *See* ASLS Reliable Plan Update at 1, (Feb. 1, 2018).
[58] See Standard 509 Required Disclosures compiled for all schools for 2016 and 2017 at www.abarequireddisclosures.org.

So I think there's actually three reinforcing data points that sort of triangulate that that's really a valid -- actually, I would say a conservative estimate of where we would be if we increase our bottom quartile by six points.[59]

**¶ 1(d)** *While the Law School has achieved or nearly achieved its LSAT targets in the last two admission cycles (for new 1L students beginning studies in Fall 2017 and Spring 2018}, it has not achieved the targets it established for UGPA. In fact, the class that matriculated in the Fall of 2017 had the lowest UGPAs at the 25th, 50th, and 75th percentiles [2.49/2.82/3.17, per Transcript of May 10, 2018 at pp. 25-26] of any class admitted during the period of 2009-2016. [September 2017 Recommendation Letter, Finding of Fact (18).] The Dean stated the Law School has established admissions goals based upon historical data from 2009-2010, intending to produce a class that would pass the bar exam on the first attempt at a 76 percent rate. [May 10, 2018 Hearing Transcript at p. 22.] However, the decline in the UGPA of matriculants at each reported percentile level raises concern about the reliability of the Law School's bar passage projection and the likelihood of success of these students. The 50th percentile of the Fall 2017 class had entering credentials of a 149 LSAT and 2.82 UGPA. According to the chart of first time bar pass rates contained in the ASLS Bar Pass Results Report, in the five years that ended February 2017, students in the LSAT/UGPA bracket that included these credentials passed the bar exam in all states at a rate of 41 percent, students in the LSAT/UGPA bracket that included the 75th percentile 152 LSAT and 3.17 UGPA passed the bar exam in all states at a rate of 57 percent, and students in the LSAT/UGPA bracket that included the 25th percentile LSAT of 146 and UGPA of 2.49 passed the bar exam in all states at a rate of 24 percent. When the Dean was asked in the May 10, 2018 hearing if she could relate the Law School's 76 percent bar pass rate projection to the ASLS Bar Pass Results Report, she said she could not. [May 10, 2018 Hearing Transcript at p. 28.]*

This paragraph pulls a variety of facts out of context, presents them in an inaccurate and misleading manner, and draws incorrect conclusions from them. The paragraph contains multiple critical errors.

- o   To begin, the 76% first-time pass rate a target for future matriculants, and has nothing to do with the fall 2017 cohort referenced throughout the remainder of paragraph (1)(d).[60] The 76% first-time pass target was derived from data regarding 2009-2010 entering cohorts,[61] which for the most part graduated in 2012 and 2013. For the July 2012 Arizona bar examination, ASLS had a 76.6% first-time pass rate: this was the source of the 76% estimate.[62]

---

[59] Acc. Comm. Hr'g., October 28, 2016 Tr. 72:6-25.

[60] The questioner in the May 10, 2018 hearing understood this, asking the Dean to relate the chart to a 148, 151 and 154 entering LSAT quartiles. The Dean could not relate the future quartile targets to a chart of first-time bar pass rates by LSAT and LGPA or UGPA as it was not the source of the 76 percent target.

[61] May 10, 2018 Hearing Transcript at p. 8

[62] July 2012 bar pass rates for the State of Arizona available at: https://www.azcourts.gov/Portals/26/admis/Stats/StatsJuly12.pdf

However, *none of this is relevant to the remainder of paragraph (1)(d)* because the quartiles *discussed throughout the paragraph are fall 2017 quartiles*, but the quartiles used in the projection were from a different period and were higher. As the dean correctly points out in her May 10, 2018 testimony:

> The entering credentials for our [fall 2017] students are 145, 149, 152…Our target has been to return to the credentials of the period of time between 2009 and 2010, when our entering credentials were at 148, 151, and 154, which would then put Summit students at a predicted first-time bar pass rate of 76 percent for all takers.[63]

o   The correct reference points for the fall 2017 entering cohort are the 50% projected first-time bar pass rate and the 86% projected ultimate bar pass rate for students admitted since August 20, 2016.[64]

o   However, as to the first-time bar pass rates by LSAT and UGPA referred to in "the ASLS Bar Pass Report", we are uncertain which of the many charts and updates provided by the Law School it refers to. It does not appear to be the chart discussed in the May 10, 2018 hearing, as (1)(d) implies. Vice Chair Bosse confirmed that the chart referred to was the one the School "had to develop as a part of the remedial plan."[65] But required chart does not match the description in ¶ 1(d).

o   But whatever chart the Council is referring to in paragraph 1(d), it is statistically inappropriate to simply pick off a narrow segment of LSAT and UGPA. With as few as 10 students represented in each cell (per the footnote on most relevant charts the School has provided), individual cells may show an unusually high or unusually low pass rate based on the law of small numbers.[66] Statisticians use regression formulas to smooth out these effects.

o   None of this relates directly to the Standards. Assuming for the sake of argument that the 41% first-time pass rate projection that the Council implies was accurate,[67] nothing in the Standards makes this a basis for a conclusion of non-compliance. Data presented previously shows that even cohorts with a 40% first-time bar pass rate had a 79% ultimate bar pass rate

---

[63] Council Hr'g., May 10, 2018, Tr. 8:12-23.
[64] ASLS Rep. at 2 (May 18, 2018). In addition, see Acc. Comm. Rec. Findings ¶¶ 30-31 (Sept. 2017). which presents historical first-time and ultimate bar pass rates for graduates with between a 144 and 146 LSAT (approximately the current bottom quartile and median for students in 2017).
[65] Council Hr'g., May 10, 2018, Tr. 28:2-5.
[66] The law of small numbers is the invalid inference that a small sample reflects the entire population.
[67] The School, in no way, believes this crude data point based on the results of 10-30 students in a narrow band is a more reliable predictor than the models the School has presented.

which would be compliant with Standard 316 and therefore Standard 301.[68]
The School's models show that every student admitted since August 2016
has at least a 50% chance of graduating and passing the bar and therefore
"appear capable" of doing so, thus meeting Standard 501.[69]

- o  As the paragraph admits, the Law School "achieved or nearly achieved its
     LSAT targets in the last two admission cycles." In fact, ASLS *exceeded* the
     median and 75th LSAT targets established in the Reliable Plan by 2 LSAT
     points for the fall 2017 entering cohort.[70]

- o  As to UGPA, the spring 2018 entering cohort *exceeded the median and 75th
     percentile targets*. These quartiles were higher than any cohort since at least
     2008. The focus on a single entering cohort (fall 2017) without taking into
     account other cohorts constitutes yet another example of arbitrary and
     capricious decision making.

- o  The School has met the Reliable Plan LSAT targets (which the Council
     improperly conflates with a supposed required metric of Standard 501(b)),
     the Council shifts to a new supposedly dispositive requirement for
     compliance: the Reliable Plan UGPA targets. This is disingenuous and
     strongly suggests that the Council had already made up its mind about the
     fate of ASLS and was now fishing for a new justification.

In an effort to ground its conclusion based on UGPA, the Council makes the
unsupported, purely subjective statement that the UGPA data "raises concern about
the reliability of the Law School's bar passage projection and the likelihood of
success of these students." But "concern" is not the same as *concern justified by the
facts*. And this "concern" is nowhere justified by the facts.

The School's predictive model incorporates *both* LSAT and UGPA but gives
substantially more weight to LSAT. The Law School repeatedly explained to the
Committee and Council that its statistical model and past history show that UGPA is
a much weaker predictor than LSAT. In the August 8, 2016 Report, for example, the
School advised the Committee "that in all cases, LSAT scores are a much stronger
predictor of success than UGPA with UGPA at times having a statistically
insignificant impact on pass rates" beyond LSAT.[71] Furthermore, the Law School

---

[68] See Acc. Comm. Rec. Findings ¶ 30-31(Sept. 2017).
[69] ASLS Rep. at 2 (May 18, 2018).
[70] The Reliable Plan submitted May 15, 2017 (p. 5) indicated LSAT targets of 146/147/150 for the 25th
percentile, median and 75th percentiles of the Fall 2017 entering cohort. Fall 2017 actuals were reported as
146/149/152 in the September 2017 Recommendation to the Council Finding of Fact (19).
[71] See ASLS Resp. at 25-26 (August 8, 2016); *Id.* at 33 (UGPA was not statistically significant in other analysis).
See also testimony from Dean Shirley Mays, Acc. Comm. Hr'g., Oct. 28, 2016, Tr. 26:9-11
(she explains "we have found that the LSATs are much more predictive as opposed to undergraduate GPAs");
Id. at 27:2-5 ("We certainly looked at undergraduate GPA, particularly for those with lower LSAT scores. But
we don't target undergraduate GPAs because we haven't found them predictive"). See also Council Hr'g., May

obtained "[t]wo independent evaluations of Summit's statistical modeling" both of which supported the Law School's modeling and conclusions.[72] So the Council's "concern" is no more than speculation and a transparent effort to find facts to support its prejudgment.

Yet, even if the Council's "concern" based on UGPA were justified and were relevant to compliance with Standard 501(b), the School had no notice that the Reliable Plan UGPA targets would now be deemed dispositive of compliance, and the School had no opportunity to respond or take corrective action. This lack of notice until after a decision has been made, and failure to provide an opportunity to respond or cure, is yet another recurring form of arbitrary and capricious decision making and disregard of basic requirements of due process.

Finally, the concluding sentence is highly misleading. The dean was merely stating that she is not an expert in statistics or in the predictive model. In no way does it suggest that the projections are wrong or ill-founded.

### *What the Council "in particular notes": Attrition*

*¶ 1(e)[73] The Law School reported a cumulative first year non-transfer attrition rate of 21.5 percent on its 2016 Standard 509 Information Report. The Fact Finders calculated total 1L non-transfer attrition of 35 percent for 2016-2017. [September 2017 Recommendation Letter, Finding of Fact (28).] These data create a rebuttable presumption that the Law School is not in compliance with Standard 501. [Interpretation 501-3.]*

Interpretation 501-3 creates a "rebuttable presumption" of non-compliance with "the Standard." But, in the words of Council Chair Maureen O'Rourke, this is a "fuzzy" requirement. It fails to specify whether the presumption of non-compliance relates to Standard 501(a), 501(b), or 501(c), and if so to which element of each of those standards. It fails to identify the cohort to be used in measuring compliance. And it completely fails to specify what a school need do to rebut the presumption.[74]

---

10, 2018 , Tr. 27:1-4, where Dean Willrich testified "one of the things that we have determined with respect to success on the bar exam is that it's not the undergraduate grade point average that's determinative." The point is further reinforced by publicly available studies including the LSAC National Longitudinal Bar Passage Study (1998), which stated that "UPGA...failed to make a practical additional contribution to a bar-passage prediction model that already included LGPA and LSAT scores." Linda Wightman, "LSAC National Longitudinal Bar Passage Study. LSAC Research Report Series." (1998) p. ix, accessible at https://files.eric.ed.gov/fulltext/ED469370.pdf.

[71] See ASLS Update Rep. at 24 (Feb. 21, 2017).

[72] See Id.

[73] Paragraph 1(e) is lengthy and comprises many distinct assertions. For the convenience of the reader, we break this paragraph into parts and separately address those parts.

[74] The Interpretation should be contrasted with Standard 316(c), which provides an extensive and detailed list of factors that would support an extension of the period to show compliance with Standard 316(a).

In summarily concluding that the presumption is not overcome, the Council ignores the facts that:

- Interpretation 501-3 is a new requirement, approved by the House of Delegates in February 2017. The Council applies the new requirement to *students and classes admitted before its effective date*. It is made into an ex post facto standard.

- The record is clear that the School had been working to comply with the new Interpretation. For instance, in the March 11, 2017 Council hearing (approximately 1 month after the new Interpretation 501-3 became effective), Dean Willrich testified that:

  > And I think that since the – the revised attrition standard has been in place, I think we were looking at higher attrition rates, you know, a year or so ago. But as the – as the new standard has been in place, we're going to have to adapt ... so that it's the nontransfer attrition that is below 20 percent.
  >
  > So we recognize that for ... the admitted class in 2015, it was above that. Potentially for 2016, we've had a number of people either, you know, leave or be dismissed at this point. That could potentially be above that. But we – we know that moving forward, we've got to manage within – within that standard, ... and the school would.[75]

  Neither the Council nor Committee expressed any concern with the School's transitional plans.

- The reason for including voluntary withdrawals in the calculation of attrition is to prevent law schools from gaming academic dismissal data by encouraging withdrawals of those students who were at risk of being academically dismissed. But, as the Law School has made very clear in the record:

  > Our withdrawals typically have LGPAs that are similar to the overall class. They ... do not appear to mimic the people that [will be academically dismissed] if that's the question. They have significantly higher LGPAs and predicted pass rates. They leave for various reasons.[76]

  And the September 2017 Recommendation to the Council shows that the median LSAT of students who were academically dismissed during 2016-

---

[75] Council Hr'g, Mar. 11, 2017, Tr. 33:14-34:4.
[76] Council Hr'g, Mar. 11, 2017, Tr. 32: 4-9.

2017 was 140 while the median of students with "other" non-transfer attrition was 148 (and thus significantly above the entering median LSAT at the time).[77]

- The non-transfer attrition inevitably includes students who voluntarily withdrew as a result of the School's being placed on probation. For example, voluntary non-transfer attrition levels jumped from 7.7% in 2015-2016 to 14.6% in 2016-2017.[78] Accordingly, the Council punishes the School for the inevitable consequences of what the Council had previously imposed upon the School. Not to factor these readily foreseeable, adverse consequences of probation into the Council's finding is yet another form of arbitrary and capricious decision making.

- The data, the plan, and the predictive model had never before been questioned. Yet, they are suddenly elevated to a new ground for finding the School out of compliance, without the School being given notice and an opportunity to respond.

*In July 2017, the Law School reported that "Academic attrition will be managed within a range of 15-20 percent for the 2020 and 2021 cohorts" [ASLS Reliable Plan Addendum 07-20-2017, Appendix D to Fact Finders Report at p.1.] This statement indicates that the Law School may not expect to be in compliance for the entering classes over at least the next two years. In its May 18, 2018 Submission, the Law School states that its predicted non-transfer attrition of the Fall 2017 and Spring 2018 cohorts is 16 percent, but it provided no supporting data or explanation for this statement. [May 18, 2018 Submission at p. 3] In light of recent attrition and the Law School's prior statement, the Council does not consider the statement in the May 18, 2018 Submission to provide a sufficiently reliable basis on which to determine that the Law School is in compliance with Standard 501.*

The statement regarding the 15-20% target attrition for the 2020 and 2021 cohorts is found in a description of the statistical model for bar passage. The statement clearly refers to *graduating* cohorts, not entering cohorts. The full statement reads:

Academic attrition will be managed within a range of 15-20% for the 2020 and 2021 cohorts. Academic attrition for the 2017 cohort has already occurred and the vast majority of expected academic attrition affecting the 2018 and 2019 cohorts has already occurred.[79]

It is nonsensical to interpret this statement (written in May 2017) as referring to entering cohorts, *as the 2018 and 2019 entering cohorts obviously had not yet*

---

[77] Calculated from individual student LSATs provided in Acc. Comm. Rec., findings ¶ 28 (Sep. 2017). Median UGPAs were also higher for students with other non-transfer attrition (2.96) vs. academic attrition (2.83) though, as is expected, the difference is significantly less than with LSAT scores.
[78] Acc. Comm. Rec. findings ¶28 (Sep. 2017).
[79] Fact Finder Rep., Appendix D (July 9-11, 2017).

*matriculated.* The Council cannot assert that "[t]his statement indicates that the Law School may not expect to be in compliance for the entering classes over at least the next two years."

### *What the Council "in particular notes": Academic Support*

*¶ 1(f) Turnover in the Law School's academic support program has been substantial and persistent. The September 2014 Committee Decision Letter found that there had been three interim directors of the Academic Success Program in the past three years. [September 2014 Committee Letter, Finding of Fact (31).] In 2016, the Law School reported that at the end of 2014, it had 100 percent turnover of the Academic Success department with a new team recruited in 2015 which were found to be ineffective. [ASLS ABA Response, August 8, 2016 at p. 41.] The three academic support professors identified in the May 15, 2017 Reliable Plan have all left the Law School. [ASLS Reliable Plan at p. 58; Transcript of May 10, 2018 at pp. 40-41.] Four people have been hired since August 2017 to staff the academic support program. [Transcript of May 10, 2018 at p. 13-14.] While one of the individuals newly hired for the academic support program has special education experience, the background and credentials of the new team do not demonstrate sufficient academic support experience, particularly in the legal education context. [Appendix C to Response to Fact Finder Report; ASLS Reliable Plan Update 02-01-2018 at 4-5; Transcript of May 10, 2018 at pp. 42-43.)]*

The conclusion that turnover in academic support staff has been "substantial and persistent" is yet another example of the Council's misuse of the language of Standards and Rules. The "substantial and persistent" phrase in the first sentence derives from Rule 16(a)(1), which permits imposition of sanctions for, inter alia, "[s]ubstantial or persistent noncompliance with one or more of the Standards." This has nothing to do with the application of Standard 309(b). To brand staff turnover as "substantial and persistent" is mere epithet without substance. It serves no purpose other than to suggest, without justification, that the turnover is sanctionable.

But in fact, by the plain language of Standard 309(b), turnover in academic success staff is *not even* a violation. Standard 309(b) deals with *the design and delivery of academic support*: whether a program is properly designed and how well and how thoroughly a school provides it to students. It says nothing about staff, their credentials, or their turnover.

Moreover, even if the Council's novel modification of this Standard were legitimate, what are the characteristics required? What rate of turnover is allowed? The Council seems to think experience and training are dispositive, but the Council never explains. Paragraph 1(f) is thus another example of chronic disregard for the language of a Standard or Rule.

The conclusion in paragraph 1(f) is vitiated on still other grounds. The School has continuously supplied the Committee with résumés of its academic success staff.[80] Moreover, the record shows that the recent hires have *stronger* credentials than those of academic support staff members at the time of the 2013 site inspection.[81] Yet those weaker credentials did not raise any Committee or Council concern over the qualifications of the academic success staff, let alone provide the School with an opportunity to respond to those concerns.

The record also clearly indicates, and the Council again ignores, the fact that there are 3-4 times more academic support staff currently per student than there were in 2011-2014.[82] Dean Willrich indicated in her May 2018 testimony that there were only 36 students per academic success instructor compared to historical periods when there were more than 100 students per academic success instructor.[83] Publicly available data show that a ratio of 36-to-1 Academic Support instructors to students at a law school is truly unprecedented.[84]

Finally, paragraph 1(f) is an example of using the inevitable results of probation to cite new supposed deficiencies on the part of the School. The Council fails to recognize the success of the School in overcoming the obvious and expected impact of probation on retention and recruitment of academic support staff.

**¶ 1(g).** *The professor with experience providing instruction in bar preparation programs who was hired by the Law School in August 2015 to run the bar preparation program left the Law School in August 2017. Three of the individuals who make up the faculty of the academic support program are now teaching the bar preparation program at the Law School. One is identified as having previously served as a bar exam coach at the Law School, but their credentials submitted by the Law School do not demonstrate direct experience teaching bar preparation courses. The Dean reported that Kaplan and BARBRI will provide training for the academic support professors and faculty members on how they should be teaching students with respect to the bar exam. [Transcript of May 10, 2018 at pp. 44-45] There was no report by the Law School about the nature of this training or how the Law School determined that the training would be adequate to address the lack of demonstrated academic support experience of those it hired to do this work.*

---

[80] See, e.g., Fact Finder Rep. App. B (July 9-11, 2017); ASLS Resp. to Fact Finder Rep. App. C (Aug. 31, 2017).
[81] The Fact Finder Report shows that one of the Academic Support hires had "significant academic support experience." Fact Finder Rep. at 11 (July 9-11, 2017).
[82] See ASLS Resp. at 40 (Aug. 8, 2016) (showing 105 to 121 students per academic support instructor between 2011 and 2014. The report indicates that the rate was anticipated to decline to 47 students per academic support instructor in 2017).
[83] See Council Hr'g. May 10, 2018, Tr. 14, 43.
[84] The Council's logic is also inconsistent with well accepted readings of other Standards. For example, Standards 203 and 401 deal with the hiring of deans and faculty, but impose no requirements concerning their credentials. The logic of paragraph 1(f) suggests that a School would violate the Standards to hire deans and faculty who have no prior teaching or decanal experience.

The response to paragraph 1(f) applies equally to paragraph 1(g).

In addition, if the Council had been concerned about the lack of details during the Dean's testimony, it could have asked her for additional information at the time of the hearing. The School had no reason to believe that training by Kaplan and BARBRI, known leaders in the field of bar preparation, would be deemed insufficient to show that the training would be rigorous.

### *What the Council "in particular notes": Bar Passage Data and Projections*

*¶ 1(h). While the Law School has not been formally determined to be out of compliance with Standard 316 (Bar Passage), recent bar exam outcomes are relevant to the Law School's ongoing compliance with Standard 301(a), Standard 309(b), and Standard 501(b). In addition, Interpretation 501-1 states that "Among the factors to consider in assessing compliance with [Standard 501] are ... the bar passage rate of its graduates. ... Compliance with Standard 316 is not alone sufficient to comply with [Standard 501]."*

Paragraph 1(h) is misleading, as the reference to "recent bar exam outcomes" (as well as the contents of paragraphs 1(i) and 1(j)) makes clear that the Council is dealing only with first-time bar passage. But, as noted above, Standards 301(a) and 501(b) refer to graduates being capable of "admission to the bar"—not to graduates passing the bar examination on the first-try. And Standard 309(b) deals only with graduates "becom[ing] members of the legal profession," without reference to their being admitted to the bar. An individual can become a member of the legal profession (e.g., paralegal, limited license legal technician, patent agent, or in Arizona a justice of the peace pro tem[85]) without passing a bar examination. And as also noted above, under Standard 316(a), satisfaction of either of the two metrics in Standard 316(b) ipso facto satisfies the requirement of Standard 301(a) that the program of legal education "prepare[] its students, upon graduation, for admission to the bar." The Interpretation that the Council cites—providing that "[c]ompliance with Standard 316 is not alone sufficient to comply with [Standard 501]—reinforces this point under basic principles of statutory interpretation.

In addition, paragraph 1(h) ignores the facts that:

- The Law School had substantial data that students admitted with lower indicators (almost exclusively through the AAMPLE program) would succeed, and it relied on this data in making admissions decisions. Nothing in the record contradicts, or even questions, this. Standard 501(b) is met.[86]

- The record shows that ultimate bar pass rate exceeded 75% for graduates over the previous five years. Thus, the Standard 316(a) and, by extension, the

---

[85] Ariz. Rev. Stat. § 22-122 (2018).
[86] As noted previously, prior to 2015, 82% of ASLS AAMPLE students had passed a bar examination. See ASLS Rep. (Aug. 2015), p. 66.

bar pass requirement of Standard 301(a), are is met.[87]

- A single-year's ultimate bar passage rate will increase as members of the cohort take and pass the bar examination on a further attempt.

- The August 2016 Response to the ABA provides data showing that "the vast majority (of graduates) from the 25th LSAT and UGPA percentile were employed nine months after graduation in those positions for which their law degree afforded them a distinct advantage."[88] Thus, the portion of Standard 309 requiring the Law School to prepare graduates to "become members of the legal profession" is met.

In summary, paragraph 1(h) is another example of the Council's (and Committee's) misreading of Standards and highly selective use of facts in the record.

*¶ 1(i). The Dean testified that the Law School has seen that students with a 2.5 or above law school grade point average are successful on the bar exam. [May 10, 2018 Hearing Transcript at pp. 27, 34.] However, the chart created by the Law School and provided to students shows that students with a 2.5-2.74 LGPA passed the Arizona bar exam on first attempt at an average rate of 28 percent across all LSAT scores during the last five years. [Chart I of the Student Memo.] A revised version of Chart I of the Student Memo contained in the Law School's May 18, 2018 Submission shows that for the past three years (February 2015-July 2017) the first attempt pass rate for students with a 2.5-2.74 LGPA taking the Arizona bar exam was 13 percent across all LSAT scores. [May 18, 2018 Submission at p. 7.] Students graduating with a 2.5 LGPA over the last four years have fallen into the 3rd quartile of the graduating classes, and that quartile has passed the Arizona bar exam on first attempt at a rate of 15 percent. [Chart II of the Student Memo.]*

The response to paragraph 1(h) applies equally to paragraph 1(i).

To make a point that should by now be obvious, there is nothing in Standards 501(b), 301(a), or 316 that establishes first-time bar passage rates by LGPA bands or ranges of a cohort as a metric for compliance. Had we known of the Council's concern regarding this specific data-point, we would have shared data concerning the ultimate bar passage rate of students with LGPA in the 2.5-2.74 range. But the Council did not advise us of this concern and elected to proceed on the basis of incomplete information. This is a further example of the failure of the Council and Committee to identify what they believe Standard 501(b) requires to be shown until *after* an adverse decision is rendered—here, a final decision to revoke accreditation.

---

[87] See, e.g., "[t]he ultimate bar pass rates for our graduates is 76%." ASLS Rep. (Mar. 1, 2016) p. 5; details provided by graduating cohort at ASLS Rep.,(Aug. 2016)  p. 2; see also Council Hr'g, Mar. 11, 2017, Tr. 8:6-7. Most recently, the School reported that "we have maintained the ultimate bar pass rate in compliance with Standard 316." Council Hr'g, May 10, 2018, Tr. 12:3-6.
[88] ASLS Rep. (Aug. 2016) pp. 65-66.

*¶ 1(j). The Law School's bar pass results on the last three Arizona bar examinations have been as follows:*

|                     | FEBRUARY 2017 | JULY 2017 | FEBRUARY 2018 |
|---------------------|---------------|-----------|---------------|
| **FIRST TIME TAKERS** | 29.5%       | 25.7%     | 31.1%         |
| **REPEAT TAKERS**   | 17.2%         | 18%       | 13.5%         |
| **OVERALL**         | 22.7%         | 20.1%     | 19.8%         |

*[February 2017 Arizona Bar Exam Results attached to ASLS Reliable Plan; July 2017 Arizona Bar Exam Results Submitted by Law School October 16, 2017, February 2018 Bar Exam Results Submitted by Law School May 11, 2018.]*

The responses to paragraphs 1(h) and 1(i) apply equally to paragraph 1(j). Nothing in the Standards establishes results of a single bar examination administration as a metric for compliance.

What the Council and Committee persistently ignore is the significant fact that *first-time bar pass rates do not reflect ultimate success on the bar exam*. The Managing Director made this very point in the 2016 NACIQI hearing (see p. 5, *supra*). The point has also been noted in many publicly available studies. For example, as noted in the LSAC National Longitudinal Bar Passage Study:

> The lower first-time pass rates are the source of much of the negative publicity about low bar passage rates for selected groups of law school graduates. Eventual passing rates produce the final evidence of whether some groups of law students are disproportionately lost to the profession and these rates are considerably higher than first-time rates for all students.[89]

Data in the record also demonstrate this. For instance, while the first-time pass rate for 2014 graduates was 45%,[90] the Law School reported a 70% ultimate bar pass rate for that cohort after the February 2016 bar exam.[91] The ultimate bar pass rate for 2014 graduates climbed to 78% after the July 2016 bar exam.[92] The current pass rate for 2014 graduates stands at 81%. In general, bar passage data show the following:[93]

---

[89] See, e.g., Linda F. Wightman, LSAC National Longitudinal Bar Passage Study (1998), which noted that "[t]he eventual pass rates increased substantially over first-time rates for all examinees" and "[a]lthough students of color entered law school with academic credentials, as measured by UGPA and LSAT scores, that were significantly lower than those of white students, their eventual bar passage rate justified admission practices that look beyond those measures."

[90] First-time bar pass rates for 2014 are reported as 52.4% in the Standard 509 report including 2014 graduates and graduates of earlier years who took the exam for the first time in 2014.

[91] ASLS Resp., at 2 (Aug. 2016).

[92] ASLS Reliable Plan, at 31 (May 2017).

[93] Data through the February 2016 bar exam was previously shared in ASLS Rep. (Aug. 2016) p. 2. Data reported through Feb 2018 exam was not previously available.

| Year | First-time | Thru Feb '16 bar exam[94] | Thru Feb '18 exam |
|------|-----------|---------------------------|-------------------|
| 2011 | 63% | 93% | 94% |
| 2012 | 73% | 95% | 98% |
| 2013 | 61% | 85% | 90% |
| 2014 | 45% | 70% | 81% |
| 2015 | 39% | 46% | 73% |

The data presented in paragraph 1(j) are thus misleading and irrelevant to evaluation of compliance with the Standards.

*¶ 1(k). The Law School has projected ultimate bar pass rates for the years, 2017-2019 as follows, as reported in Finding of Fact (35) of the September Recommendation Letter:*

| 2017 | 60% |
|------|-----|
| 2018 | 64-66% |
| 2019 | 68-71% |

*[See also ASLS Reliable Plan Addendum 07-20-2017, Appendix D to Fact Finders Report at p. 4.] The Law School stated that its "models show that [the Law School's] ultimate rate will be below 75 percent for each of the three years 2017-2019." The Law School further acknowledged that "the projected ultimate pass rates for 2017-2019 are below the levels required by [S]tandard 316." [ASLS Reliable Plan Addendum 07-20-2017, Appendix D to Fact Finders Report at p. 4.]*

Nothing in Standards 301(a) or 316 provides for using projections to evaluate compliance. *Standard 501(b) on its face requires examining data available at the time admissions decisions were made.*

In any event, the projections referred to in paragraph 1(k) were developed for purposes of the School's Reliable Plan, not for the purpose of demonstrating compliance with Standards 301(a), 501(b), and 316. *The projections were designed to be conservative (in particular, they ignored the impact of further interventions).* But, as the School notes, "[i]n our reliable plan we described the actions we plan to take to improve the pass rates of repeaters" and improve the ultimate pass rates.[95]

The Law School made similar conservative projections in its August 2016 Response to the ABA.[96] That report also used regression analysis of available results to conclude that "[a]ll three cohorts from 2014-2016 are expected to have first-time bar pass rates below [those] expected to result in 75% ultimate pass rates." *The Law School then identified a plan for increasing those results.*

---

[94] ASLS Reliable Plan, at 2 (May 2017).
[95] ASLS Reliable Plan Addendum, App. D, at 4 (Jul. 20, 2017).
[96] ASLS Rep (Aug. 2016) p. 59.

To date, those projections have been exceeded.  The record indicates 2014 ultimate bar pass rates were 78% after the July 2016 bar exam.[97] They currently stand at 81%. The ultimate bar pass rate for 2015 graduates is expected to exceed 75% after the July 2018 bar exam. Based on those updated and improved results, the revised projection of ultimate pass rate for 2016 graduates shows that it is expected to be at or near 75% while those for the 2017-2019 cohorts are all expected to exceed 75% as reported in the May 18, 2018 Supplemental Submission.[98]

**¶ 1(l).**  *At the hearing held before the Committee on September 14, 2017, the Law School testified as follows:*

> *Vice Chair Brennen: Is it fair and accurate to say that based on these projections, you do not expect the law school to have either a first-time bar passage rate or an ultimate bar passage rate for the years 2017, '18 or '19 that will satisfy the requirements of Standard 316?*
>
> *Mr. Lytle: That's what our projections indicate. At p. 59.*

The response to paragraph 1(k) applies equally to paragraph 1(l).

Furthermore, the May 18, 2018 Supplemental Submission states that updated projections (using the same statistical methods we disclosed previously) show that projected pass rates are expected to exceed 75% for each of these cohorts. These projections could not have been shared at the hearing as the February 2018 Arizona bar results were not released until the day after the hearing.

**¶ 1(m).** *In its February 01, 2018 Update, the Law School states: "Arizona Summit Law School has a projected gap of 17 bar passers to be compliant through the 2017 graduating cohort, with the standard of achieving a 75 percent ultimate pass rate for the last five-calendar year graduation cohorts." [February 1, 2018 Letter at p. 6.]*

The response to paragraph 1(k) applies equally to paragraph 1(m).

In addition, as with the other ultimate bar pass projections discussed above, ASLS results exceeded expectations for this period and the School is currently compliant with the ultimate bar pass rate for the five-year period ending with the 2017 graduating cohort.

**¶ 1(n).** *The projections and statements by Law School representatives indicate that the Law School may be out of compliance with Standard 316, in that its ultimate bar passage rate is*

---

[97] See discussion of ¶ 1(j), supra and ASLS Reliable Plan, at 31 (May 2017).
[98] ASLS Supplemental Submission to the Council submitted May 18, 2018, at. 3

*projected to be below 75 percent and further indicate that the Law School does not anticipate coming into compliance before 2020.*

*Without disputing these facts, in its May 18, 2018 Submission, the Law School predicts that cohorts admitted since August 20, 2016 will be in compliance with the ultimate bar passage requirements of current Standard 316. Those cohorts will presumably not graduate before 2019, and it would be several years thereafter before its compliance with the ultimate bar pass requirement could be determined. The Law School also states in its May 18, 2018 Submission, without explanation, that it has revised its projections for the years 2017, 2018 and 2019 and now believes "the school may be in compliance for those years." [May 18, 2018 Submission at p. 4.] The Law School provided no explanation or support for this statement, which is contrary, to detailed statistical modeling the Law School provided in July 2017 and statements that Law School representatives have made on multiple occasions. Information which could have been determined and reported at the - May 10, 2018 hearing, and subjected to questioning by the Council was not presented at that time. The Council therefore does not consider the statements in the May 18, 2018 Submission to provide a sufficiently reliable basis on which to determine that the Law School will be in compliance with Standard 316.*

> The Law School disputes the facts claimed to be undisputed in the first paragraph and did so expressly in its May 18, 2018 Supplemental Submission under the heading "Facts and Conclusions Disputed."

> As to the second paragraph, the School stated in the May 10, 2018 hearing that the Arizona bar results would be released on May 11, 2018 and that we would provide an update based upon those results. We did so in the May 18 Submission. Based on those results, we updated the projections (using the same methodology). The School reported that, accounting for bar pass data through the February 2018 bar exam, "[t]he School has revised its projections for the years noted and now believe the school may be in compliance for those years."

> In any event, paragraph 1(n) is largely irrelevant since nothing in Standard 316 makes the *possibility of future noncompliance* a basis for a conclusion of *present noncompliance*.

## <u>*Supposed Failure to Comply with Conditions of Probation and Erroneous Information*</u>

*¶ 2(a).*[99] *Pursuant to the March 2017 Council decision and as a condition of its probation, the Law School is required, each semester, within 30 days of the completion of the assignment and distribution of semester grades for the Law School's students, to advise each student, in writing, of: (a) Arizona's first-time bar examination passage rates, by class quartiles, for Law School graduates sitting for the Arizona bar examination over the six administrations preceding the semester; and (b) the class quartile into which the student then falls. [Council March 2017 Decision Letter, Conclusion 4(f).] The Law School submitted a memo it sent "to*

---

[99] Paragraph 2(a) is lengthy and comprises many distinct assertions. For the convenience of the reader, we break this paragraph into parts and separately address those parts.

*the approximately 145 enrolled students" of the Law School dated January 18, 2018 (the "Student Memo"). The Student Memo the Law School submitted advises the student in question that he is "ranked as 4th and in the 3L quartile." The Memo also shows that 83 percent of students in the top quartile (which would include the 4th ranked student) in previous classes passed the bar on the first attempt. The Dean acknowledged that the report was mistaken and should have reported that the student in question was not ranked 4th but was in the 4th quartile in the 3L class. Of students in the 4th quartile in prior classes, four percent passed the Arizona bar exam on the first attempt. [Student Memo; Transcript of May 10, 2018 hearing at pp. 52-53, 57-65.]*

The Law School acknowledges that there was a typographical error in the January 18, 2018 student disclosure. The error does not occur in previous versions sent to students.

But the error is irrelevant. First, as is discussed in greater detail below, *the Council confuses two charts in the disclosure:* Chart II, reflecting bar passage rate by quartile, which was required as a term of probation, and Chart I, providing more granular and more useful information to students, which was *not* required as a term of probation. *The Council is simply contending here that the non-required Chart I fails to comply with the requirements for Chart II.*

Second, to be material, the language objected to would have to have misled a 4th quartile student into believing he or she was ranked 4th in his or her class and that similar students had an 83% first-time bar pass rate in the previous 6 bar exams. The Council simply assumes that this is the case this without any evidence or argument. But for multiple reasons the assumption is entirely unreasonable.

*First,* it is implausible to believe that a student in the 4th quartile, with an LGPA below 2.50, would believe he or she was ranked 4th in the class after receiving the communication. Even to suggest this defies common logic and betrays disrespect for ASLS students.

*Second,* there is no evidence in the record of any student being confused by the disclosure or even asking for clarification. Indeed, Dean Willrich testified that no student had raised any questions or concerns.[100]

*Third,* no clarification was needed because the cover memo to the disclosure fully explains the information in it. Specifically, it states that "we have group[ed] each of you by grade level (1L, 2L & 3L) based on your earned credits. . . . and divided everyone into quartiles. With this information you are able to estimate your predictability for passing the bar based on your current quartile using Chart lI." There is nothing in the disclosure that remotely suggests students are being

---

[100] ABA Council Hr'g., May 10, 2018, Tr. 52:19-20.

grouped by class standing.

*Fourth,* Chart I, which was not required but which the School supplied in order to provide more useful information to students, provides an even more granular classification of students (by 0.25 LGPA points and by LSAT) than the required Chart II (by quartile or about 0.50 LGPA points on average). In the purely hypothetical case that a student with LGPA less than 2.50 LGPA believed he or she was ranked 4th in the class and in the top quartile, Chart I would immediately correct that misunderstanding.

*Fifth,* the information in the disclosure and similar information had been shared repeatedly, in various forums and communications, since fall 2016. As discussed below, students understood and had grown accustomed to such communications.

The Council's conclusion is preposterous and strains to support an unsupportable conclusion. Sometimes a typo is just a typo.

*The Dean acknowledged other errors and inconsistencies in the Student Memo during the May 10, 2018 hearing, . . .*

The School had provided the Committee and Council with earlier examples of the same form of student communication and neither the Committee nor Council expressed any concern with it. As a result, the School had no notice or reason to believe that the Council would now challenge it.

Paragraph 2(a) also fails to note that the record plainly shows the Law School has been dedicated to transparency and accurate reporting of data to students and began communicating bar pass risk to students *at least 3 years before ever being asked to do so by the ABA.*

- The 2014 decision letter states, based on the 2013 Site Report, that "[s]tudents with a GPA between 2.0 and 2.5 are notified that they are at risk of not passing the bar exam and must contact the Academic Success Program to develop a plan to improve performance."[101]

- The Reliable Plan reports that "[s]tarting in the fall of 2016, students were informed of bar pass predictability as it pertained to law school GPA."[102]

- Deputy Managing Director Bill Adams, in an email dated August 31, 2016, had confirmed to Dean Shirley Mays that the Committee was aware that the Law School had sent an email to students with bar pass rates broken down roughly by quartile over the previous two administrations of the bar exam.

---

[101] See Acc. Comm Dec., findings ¶ 28 (Sep. 2014).
[102] ASLS Reliable Plan at 40 (May 15, 2017).

This was four months prior to the Committee's recommendation to the Council that the Law School supply such information and seven months prior to being directed by the Council to do so.

*...including the fact that the Student Memo reported bar pass outcomes for 4.5 years by LSAT/UGPA...*

The Council here is referring to the non-required Chart I of the Student Disclosure. The data in Chart I is accurately labeled and correctly reports the data to the best of our knowledge.

*... and for four years for LGPA quartile instead of the past three years (six administrations) of the Arizona bar as directed in the March 2017 Council Decision Letter. [May 10, 2018 Hearing Transcript at pp. 48-53, 60-65.]*

This is incorrect. The Dean was mistaken in her May 2018 testimony because, as explained above, the Council's and Committee's prior lack of objection to the disclosures had reasonably led her not to expect the questions posed by the Council on this subject.

*The fact is that Chart II accurately reports first-time bar pass results for the previous six administrations, as the Council required.* But students taking the bar exam over the previous three years had graduated over the previous *four years*. Thus, while bar pass data is reported for three years, the LGPA quartiles are reported for four years. And because the ranges of LGPA quartiles vary by graduating cohort, four years of LGPA data had to be presented. *This does not mean that bar results are included for each of those four years.*[103]

*Further, both the text of the Student Memo and the LGPA quartile Chart II erroneously stated that Chart II was reporting "the last six bar examinations" when it actually reported four years (eight bar exams) of results. [Student Memo at p. 1 & 2.]*

This is inaccurate for the reasons explained above. The text of the Student Memo and description of Chart II both accurately reflect that the data included is for "the last six bar examinations."

*¶ 2(b). Prior student memos dated June 28, 2017 and August 25, 2017 also reported four or more years of data on bar passage rates instead of the past six administrations of the Arizona bar examination, as directed in the Council March 2017 Decision Letter and as stated*

---

[103] Following the May hearing, the School sent a revised version of the chart to students. *The bar pass rates by quartile did not change in this revision, as both the original communication and revised communication accurately reported first-time bar pass rates over the previous six bar administrations.* This fact shows that both memos report the same information. If, as claimed by the Council, the School had initially reported four years of bar pass data, the pass rates by quartile would have changed.

*elsewhere in the student memos. [August 25, 2017 Letter to Students, Appendix F to School's Response to Fact Finder Report; June 28, 2017 student memo.]*

The response to paragraph 2(a) applies equally to paragraph 2(b).

**¶ 2(c).** *The Law School submitted an updated student memo in its May 18, 2018 submission. When corrected to report only the past three years (six administrations) of the Arizona bar, the updated student memo showed that substantially lower percentages of students in lower law school GPA brackets passed the bar exam on the first attempt. The January 2018 Student Memo that used 4.5 years of bar pass data, told students that eight percent of graduates with LGPAs of 2.0-2.24 passed the bar the first time, as well as 15 percent of students with LGPAs of 2.25-2.49, and 28 percent of students with LGPAs of 2.5 2.74. The updated notice, based on the last six administrations of the bar (as required by the terms of the Law School's probation) showed that four percent of prior students with LGPAs of 2.0-2.24 passed the bar the first time, as well as four percent of students with GPAs of 2.25-2.49, and 13 percent of students with GPAs of 2.5-2.74. [May 18, 2018 Submission at p. 7].*

The response to paragraph 2(a) applies equally to paragraph 2(c).

As explained above, the bar pass results in Chart II (reported by quartile over the previous six administrations) did not change. Chart II is the only part of the Student Disclosure subject to the Council's probation directive. And, as explained above, all data in it is accurate and correctly labeled.

In addition:
- The revisions to Chart I were not "corrections" as there was nothing inaccurate or misleading about the original communications. We revised the charts following the May hearing but, unfortunately, the revision yields substantially *less* information for students.

- The Council again assumes that the differences described are misleading and that students were misled. There is no evidence of this in the record or elsewhere. And this is not a surprise, since whether one is told that:
  - Over 4.5 years, students with LGPA below 2.25 had an 8% first-time bar pass rate; or that
  - Over 3 years students with an LGPA below 2.25 had a 4% first-time bar pass rate;

  cannot credibly be treated as a material difference on which students will rely.

- The chart provides LSAT data *and* LGPA data combined because the School's experience is that looking at results *only* by LGPA or LSAT is incomplete and potentially misleading. The data bears this out. For instance, over the previous 4.5 years, 44% of students passed a bar exam on the first-attempt

with a 2.25-2.49 LGPA and a 152-153 LSAT versus 0% for students with the same LGPA but less than a 140 LSAT. Those differences are much more relevant than the smaller, generalized variations described by the Council.

*¶ 2(d). As a result of the Law School's failure to comply with the conditions of its probation, the Law School has reported bar passage data to students that was higher than the information that students would have received had the Law School complied with the terms of its probation. Further, the errors and inconsistencies in the student memos show that the Law School has not exercised appropriate care in communicating with students about these issues.*

The response to paragraph 2(a) applies equally to paragraph 2(d). In particular, the conditions of probation applied only to Chart I. As the Fact-Finding Report explained:

> The decision letter requires the  Law School to provide each student with the Arizona first-time bar examination passage rates by class quartiles for the Law School's graduates for the last six bar examinations [Chart II]. *In addition* (emphasis added), Law School provided students with information on first-time pass rates for all states from 2012-2016 organized by LSAT and final law school grade point average (LGPA) [Chart I].[104]

The Council was fully aware that Chart I was not a condition of probation.

In any event, as explained above, no bar result data changed in Chart II upon revising the chart.

As to the contention of lack of "appropriate care" by the School, there is no evidence in the record regarding other communications with students, or student reliance on such other communications, to justify such a conclusion. And such a contention is inconsistent with the record of the School's consistently providing students with timely information about their likelihood of bar passage since well before the Committee and Council directed the School to provide such information.

### Refusal to Extend the Period for Compliance

*¶ 3(d). Following the Committee's September Recommendation Letter, the Law School did not renew its request to extend the two-year period to the Council. Instead, on October 26, 2017, the Law School requested a deferral of the Council hearing scheduled for November 2017 to May 2018, stating that deferral would "ensure that Summit has the full two-year period to demonstrate our reliable plan is sound and that we can maintain compliance with the Standards."*

---

[104] Fact Finder Rep., at 8-9 (July 9-11, 2017).

The Council's logic here is that requesting a deferral of the November 2017 hearing until May 2018 somehow replaces the School's express request for an extension of the two-year period. This is a non sequitur: there is no inconsistency in requesting an extension of the hearing until May 2018 and simultaneously and contingently requesting an extension of time in the event the School is not found in compliance by May 2018.

Moreover, nothing in the Standards, Rules of Procedure, or communications from the Committee, Council, or Managing Director gave the School any notice that it would have to renew its request to extend the time for coming into compliance. To deny the request to extend the time for coming into compliance because the School did not meet a nonexistent requirement is patently arbitrary and capricious.

*¶ 3(e). Based on the record, including the additional information submitted by the Law School through May 18, 2018, the Council finds no good cause to extend the time for the Law School to come into compliance.*

This assertion disregards the clear record that the Law School made substantial improvements in entering class profiles beginning in April 2016 and continuing thereafter. Specifically, the 25th percentile LSAT increased from 140-141 in years immediately prior to 2016 to 146 in Fall 2017. Median LSAT similarly increased from 143-144 to 149 in Fall 2017.[105]

*These improvements in median and 25th percentile LSAT between 2016 and 2017 were larger than for any other ABA accredited law school in the country.*[106] Paragraph 3(e) offers no explanation for disregarding this significant part of the record.

In addition, since most of the initiatives in the Reliable Plan were adopted and implemented between Spring 2016 and Fall 2017, only a few of them would have had significant impact on first-time bar exam results prior to 2018. Nonetheless, the Fact-Finding Report states that "[t]he Law School is beginning to see some results from the changes in the academic program and academic standards described in the Reliable Plan."[107] It provides as examples that:

- "[S]everal professors report significant improvement in student performance on essay and multiple choice questions on final exams."

- "Another professor reports improvements in foundational legal writing courses during the first year."

---

[105] See Fact Finder Rep., at 3 (July 9-11, 2017) and ASLS Rel. Plan Update at (Feb. 1, 2018).
[106] See Standard 509 Required Disclosures (2016 and 2017) www.abarequireddisclosures.org.
[107] Fact Finder Rep. 10 (July 9-11, 2017.

- "In the academic support program, 7 of 10 students on probation who took the Mastering Legal Skills class taught for the first time in summer 2016 were successful and have graduated or are preparing to graduate."

- "The Law School also reports that reversion from the trimester schedule to the traditional two-semester-with-a-summer-session schedule is supported by data showing that students who graduated in 36 months or more performed 12 percentage points higher on the five bar exams ending in spring 2017 than those graduating in 24 months."[108]

The Council no explanation for disregarding this significant part of the record.

*¶ 3(f). The first reason given by the Law School in support of its request to extend the period for compliance was that "the Reliable Plan is being implemented comprehensively and, ... with additional time, we will come into compliance." [August 31, 2017 Response to Fact Finder report, last page.] Based on the record before the Committee and Council, as well as the Committee's Findings of Fact and the information contained in this Decision, the Council concludes that the Law School has not made sufficient progress toward coming into compliance for there to be good cause to extend the two-year period. Moreover, the fact that the Law School requested an additional two years, to May 2020, supports the conclusion that compliance is not imminent.*

The statement that:

> [T]he fact that the Law School requested an additional two years, to May 2020, supports the conclusion that compliance is not imminent

is breathtaking in its circularity. By this absurd logic *no* request for an extension of time to come into compliance could ever be granted because the request automatically shows that compliance is not imminent. The very purpose of granting an extension is to address the fact that "compliance is not imminent."

The Council here pays no attention to the elementary facts that: (a) the purpose of remediation pursuant to a reliable plan is to bring the school into compliance; and (b) in this case there *necessarily* is a significant time-lag between the correction of a deficiency (here, LSAT profile of entering classes) and the key outcome that the Council says it is most concerned to see (increased bar passage). The Council appears to presuppose that an extension should not be granted.

Equally arbitrary and capricious is the conclusion, without more, that "the Law School has not made sufficient progress toward coming into compliance." As noted above, the School made nation-leading improvement in median and 25th percentile LSAT from 2016 to 2017. *Median and 25th percentile LSAT data have been a primary focus of the Council and Committee throughout the history of these proceedings,* and it

---

[108] Id.

is the height of arbitrariness to ignore them once the numbers become inconvenient to the Council's prejudgment. The Letter offers no criteria for "sufficient progress" and no reasoning to justify the conclusion that, despite these critical improvements in LSAT, progress has not been "sufficient." It is yet another example of decision by fiat instead of facts.

Although there are no criteria in the Standards or Rules to govern extensions of time under Rule 14, Standard 316(c) provides a set of criteria for extending the time to comply with Standard 316(a) & (b). These include bar passage trends, actions to address bar passage, efforts to provide broader access to legal education, transfer attrition, and more. The record is replete with information in these categories supporting an extension of time, yet the Council simply ignores it.

*¶ 3(g). The second reason given by the Law School in support of its request to extend the two-year period is that "extending the time is the most effective means to benefit students....[and] reassure students that they can continue their education at the [Law] School and thereby serve their best interests." [August 31, 2017 Response to Fact Finder report, last page.] The Council believes that students benefit from having accurate information about whether the Law School is in compliance with the Standards. The Law School's required disclosures to students while on probation have been inaccurate and misleading, and the Council is concerned that students timely receive accurate information.*

Paragraph 3(g) is another non sequitur. The first sentence states the School's position that extending the time to come into compliance would serve the interests of students. Rather than respond to this common-sense point, the Letter instead changes the subject and states that the Council believes "students benefit from having information." This is true, but irrelevant to the School's position that an extension of time would benefit students.

*¶ 3(h). The Law School has had multiple opportunities to demonstrate that it is in compliance with Standards 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2, and, since May 2016, the Law School has received at least four written notices of the two-year period mandated by the Department of Education regulations to come into compliance.*

The record unequivocally shows that the School has repeatedly requested guidance as to what the Committee's and Council's glosses of the relevant Standards require. Each and every time the requests have been met with silence.[109] Thus, the Council and Committee have consistently *hindered* the ability of the School to demonstrate compliance. The School has been left to guess what the Council and Committee are demanding.

Moreover, the Department of Education regulations do not impose a hard limit to the time allowed to cure any deficiency, nor do the Rules of Procedure. As discussed

---

[109] See pp. 16-17, *supra*.

below, many accreditors far better understand that a central purpose of our higher education accreditation system is to *help schools comply with quality standards and continue to improve.* The central purpose is not simply to punish them.

## THE PERVASIVENESS OF ARBITRARY AND CAPRICIOUS ACTIONS BY THE ABA

As we have shown in detail, the May 2018 Decision Letter is replete with illogic, disregard of the record, disregard of the plain language of Standards and Rules, failure to respect the elementary tenets of due process, prejudgment and speculation, and other defects that result in it's being arbitrary and capricious. These defects, and others, pervade the entire history of the proceedings and cause the Letter—which relies on those earlier proceedings—to be still further arbitrary and capricious. The record shows a chronic disregard for the norms of proper decision making.

The record is lengthy. We review prominent examples from the record and show that it contains instances of every category of arbitrariness and capriciousness identified in the *Criteria for "Arbitrary and Capricious" Review* section of this Appeal.[110]

### *Transparency*

*Failure of the Governing Rules and Standards to Clearly Articulate What is Required*

At least two of the Standards and one of the Rules primarily at issue in these proceedings are not clearly drafted. The heart of Standard 301(a) are the requirements that a "law school shall maintain a rigorous program of legal education" and that it "prepare[] its students, upon graduation, for admission to the bar. Standard 316(d) provides needed clarification for the latter requirement but the requirement of "rigor" remains unclear.[111]

Standard 501(b) requires that a school admit only "applicants who appear capable of satisfactorily completing its program of legal education and being admitted to the bar." The critical requirement is that an applicant "appears capable." This requires an examination of a school's decisions regarding the various applicants. But "appears capable" is a very hazy criterion and, in any event, one that requires examination of how the school makes decisions. It is significant that the Standard does *not* say "reasonably appears capable," but instead simply said "appears capable." The crux of the inquiry is the actual knowledge and intent of the decision maker.

Rule 16 provides as one ground for imposing sanctions "[s]ubstantial or persistent noncompliance" with a Standard. The Rule contains no guidelines for determining whether any occasion of noncompliance is substantial or persistent. Indeed, it is unclear what these

---

[110] See pp. 6-8, *supra.*

[111] Among the meanings of "rigorous" are *extremely thorough and careful, strictly applied or adhered to, adhering strictly to a belief or system, and harsh and demanding. See* https://en.oxforddictionaries.com/definition/rigorous. None of these definitions provide any greater clarity.

terms even mean in this context. For example, it is entirely unclear whether "substantial" in this context means *of considerable size,* or *of considerable importance,* or something else.[112] The choice of meaning is highly material to any analysis. Similarly, it is entirely unclear whether "persistent" means *continuing firmly in spite of difficulty,* or *continuing over a prolonged period*, or something else.[113] Further, if it means continuing over a prolonged period, it fails to indicate just how long that period must be.

*Failure to Apply the Standards and Rules as Written*

It is not surprising that the Council and Committee would feel compelled to clarify the meanings of these Standards and Rules. But one cannot "clarify" them in ways inconsistent with the language as written.[114]

   *Standard 501(b)*

The Committee and Council have treated Standard 501(b) as requiring a minimum LSAT median and 25th percentile for incoming classes, without disclosing just what the minimum requirement is. This is tantamount to secretly amending a Standard and then enforcing it. But neither the language of Standard 501(b), nor anything else in the Standards, legitimates the Committee's and Council's form of metric-based reading. Standard 501(b) requires that a school's determination at the time of the admission decision be based on the fact that the applicant "appear[s] capable of satisfactorily completing its program of legal education and being admitted to the bar." While the academic credentials of an individual applicant are surely relevant to whether he or she "appears capable," nothing in Standard 501(b) or Interpretation 501-2 suggests that a statistic about the entire admitted class, in a vacuum, is relevant, let alone dispositive.

However, the overwhelming reliance on median and 25th percentile LSAT allows one to easily see just how secret and subjective the new requirements are. As one commentator recently noted:[115]

> The ABA's first enforcement actions on the basis of admissions policies commenced in the summer of 2016, when the ABA directed Ave Maria Law School to take Specific Remedial Actions to correct its admissions policies. Ave Maria's LSAT profile for its admitted students had dropped to an unconscionably low 148/143/139 for the entering class of 2014 . . . . [The next two actions were against Valparaiso and Charlotte.] From the actions against these three schools the ABA

---

[112] See, e.g., https://en.oxforddictionaries.com/definition/substantial.

[113] See, e.g., https://en.oxforddictionaries.com/definition/persistent.

[114] The propensity for ignoring the language of a Standard or Rule even extends to cases where the language is reasonably clear, as for example, Standard 309(b). See pp. 32-34, *supra.*

[115] David Frakt, *Admissions, Accreditation and the ABA: An Analysis of Recent Law School Lawsuits,* The Faculty Lounge, (May 23, 2018), http://www.thefacultylounge.org/2018/05/admissions-accreditation-and-the-aba-an-analysis-of-recent-law-school-lawsuits-.html#more.

started to make the vague Standard 501(b) a little clearer.  At the very least, it became clear that a median LSAT of 143-145 was unacceptable.

Based on these and subsequent actions, the ABA "gradually mov[ed] up from the bottom to take action against those with median LSATs of 144 and 145, and even 146."[116] *But even if a school could discern such an implied metric, it would be unavailing, because the Council and Committee kept revising the metric.* As the commentator further noted:

> Then, in March 2018, things got weird.  At the March meeting, the ABA took action against three schools: Arizona Summit, Golden Gate, and Lincoln Memorial University Duncan School of Law.  Golden Gate had a median LSAT of 149 for 2016 and 148 for 2017.  Lincoln Memorial University Duncan School of Law had a 2016 and 2017 median of 148.  Since being found out of compliance in October 2017, in December, Arizona Summit announced that it had raised its median to 148 for 2017.  In a submission to the ABA, Coastal reported that it had further raised its median for its Spring 2018 entering class to 150.  Although these schools seemingly had substantially stricter admissions policies than the schools which had previously been found out of compliance, nevertheless all three schools were found out of compliance with Standard 501(b).[117]

Schools had no basis for knowing what minimum median LSAT would satisfy the Council and Committee. Perhaps a 151, since no school with a 151 median has been found out of compliance. But perhaps not, since at one time no school with a 147 median LSAT had been found out of compliance, and of course that changed.

But obscuring the required LSAT metric, at the same time:

> Thomas Cooley, with a 2017 median of 142, and a 2016 and 2015 median of 141 -- the lowest ever for an ABA-accredited law school (excluding Puerto Rican schools) -- was, shockingly and perplexingly, found to be back in compliance with 501(b).[118]

Yet the Council and Committee well know that it is inappropriate to rely without more on an LSAT metric and have said so publicly. In late 2015, then-Council Chair Rebecca Berch explained in an article in *Syllabus* that:

> Admission to approved law schools is regulated by Standard 501, which requires, among other things, that schools shall not admit those "who do[] not appear capable of satisfactorily completing" law school and who are not likely to be admitted to the bar. [Standard 501(b).] In admitting students, law schools of course look at respected indicators, such as an applicant's LSAT score and undergraduate grade point average. But schools also rely on other factors that may show leadership, drive, grit, or other factors that provide reason to believe the applicant may perform

---

[116] Id.
[117] Id.
[118] Id.

well in law school. Schools may require a writing sample and proof of accomplishment, such as professional position, or participation in volunteer work or student government, or other factors that demonstrate to the school's satisfaction that the student has characteristics that indicate a reasonable chance to succeed. In enforcing Standard 501, the AC and Council also consider other school-specific factors, including the school's academic attrition rate, bar passage rate, and academic support program. [Interpretation 501-1.]

Citing declining LSAT scores of admittees, some have suggested that the Council should move quickly to sanction or remove the accreditation of law schools that admit students whose LSAT scores are "too low" to indicate a chance of success in law school. But the Council cannot act precipitously, for several reasons.

First, of course, is that an LSAT score does not purport to tell the whole story of a person. (See Barry Currier's column in this *Syllabus*.) Many whose LSAT scores were not distinguished later achieved great things, in law school and in the profession. Thus, an applicant with a low LSAT score might appear to a school quite "capable of satisfactorily completing its program of legal education and being admitted to the bar" if other indicators are present. It is for that reason, among others, that the Council and its AC look at additional considerations, such as the school's academic attrition and bar passage rates. Those factors are themselves governed by Standards.

Second, schools are entitled to due process. The accreditation rules – and fairness – provide that they must be given an opportunity to justify the admissions choices they have made before sanctions may be imposed.[119]

Similarly, at the same time the Managing Director, who "is responsible for assuring that the legal requirements relating to the substance and process of law school accreditation are followed," wrote that:

Admissions is not a precise science. We should not want it to be. An applicant's LSAT score is significant in the law school admissions process, but it is just one factor. The guidelines of the Law School Admission Council (LSAC), which develops the LSAT test, specifically caution against the use of an LSAT score as the sole criterion for admission and suggest that it not be given undue weight in the admissions process simply because it is a simple, clear, and seem[ing]ly objective number to use. Certainly it should not be used as a shorthand way to refer to overall potential of a student or a group of students for law study and bar passage. . . .

. . .

---

[119] Rebecca Berch, *Immediate Sanctions for Law Schools That Have Lowered Admissions Criteria? Not So Fast*, Syllabus, (Winter 2015-2016), https://www.americanbar.org/publications/syllabus_home/volume-47-2015-2016/syllabus-winter-2015-2016--47-2-/from-the-chair.html.

The fact that one can chart the relationship between LSAT scores and first-time bar exam outcomes does not mean that that correlation should become the default way to predict the success of an individual student or group of students. It's easy to use LSAT scores as a point of reference, but there are other easy reference points as well. With respect to the bar examination, a student's and students' performances in law school is much superior. . . .

. . .

We know that substantial numbers of students outperform what their LSAT scores predict; others underperform. We know that the LSAT does not measure grit, determination, and the motivation for studying law – characteristics important for success in law school, admission to the bar, and career success. We know, as the LSAC counsels, that a host of other factors bear on the applicant's chances of succeeding in law school and on the bar examination, including the applicant's undergraduate experience (not just the UGPA but also the institution attended, major, and courses taken), graduate study, work experience, extracurricular activities, obstacles overcome, letters of recommendation/interviews, and other accomplishments and leadership positions held.[120]

Yet, in spite of these acknowledgments and warnings from leaders, the Council and Committee have relied overwhelmingly on LSAT scores—and *not those of individual students but of the admitted cohort as a whole or percentile bands within it.*

*Standards 301(a) and 316(a)*

Standard 301(a) states the following:

A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession.

This Standard has multiple requirements that are related but independent. They include, among others: (a) a requirement that the program of legal education be rigorous; and (b) a requirement that the program prepare students, upon graduation, for admission to the bar.

Standard 316(a), governing bar passage, expressly states that:

A law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates that it meets any one of the following tests . . . .

---

[120] Barry Currier, *It's (Appropriately) Complicated: Be Cautious in Using LSAT Scores to Evaluate Law Schools,* Syllabus, (Winter 2015-2016), https://www.americanbar.org/publications/syllabus_home/volume-47-2015-2016/syllabus-winter-2015-2016--47-2-/from-the-managing-director.html.

The two tests relate to first-time and ultimate bar passage. The portion of Standard 301(a) relating to bar passage is the requirement that the program prepare students for admission to the bar. Thus, according to Standard 316(a), satisfaction of one of the tests for bar passage will also satisfy this prong of Standard 301(a). The Law School has repeatedly provided information showing that it remains compliant with Standard 316. Therefore, the Law School clearly satisfies the bar pass component of 316. But it is not at all clear that the Council and Committee paid any attention to Standard 316(a) and its impact on compliance with Standard 301(a).

*Failing to communicate reasons for decisions.*

> Standard 301(a)

Thus, the Council's and Committee's conclusion of non-compliance with Standard 301(a) rest on a conclusion that the Law School does not have a "rigorous program of legal education." But the Committee and Council never shared with the School what they meant by "rigorous program" or why they deemed the School's program not rigorous.

Two aspects of this failure are telling. First, the Committee and Council showed no interest in the most telling and important evidence for rigor: what goes on in the classroom. For example, despite the Committee's and Council's express charge that the Fact Finders examine the rigor of the program of legal education, the Fact Finders did not visit a single classroom[121] and the Committee did not direct them to return to the School to do so.

Second, *the May 2018 Decision Letter says nothing about Standard 301(a) or about evidence to show compliance.* This omission is in stark contrast to the lengthy discussions of Standards 501(b) and 309(b). In the end, the Committee and Council held the School out of compliance with an unexplained "rigorous program" requirement, without any explanation and without any evidence that rigor was lacking.

> *Rule 16*

In October 2016, the Committee concluded that "issues" concerning the School's compliance with Standards 301(a), 309(b), and 501(b) were "substantial" and "persistent." The relevant rule—16(a)(1)—is not concerned with "issues." It is concerned with noncompliance. It was impossible to understand what the conclusion meant. But even if the Committee was inarticulately trying to say that noncompliance was substantial and persistent, the problem does not go away. The Committee failed to cite to any facts in the record, or relate any facts to criteria for "substantial" or "persistent" non-compliance, in order to justify its conclusion.

The School had no way to decipher the Committee's conclusion and effectively respond to it. Up until June 2015 , the Committee had no concerns about the School's compliance with

---

[121] Fact Finder Rep. 2 (July 9-11, 2017).

the three Standards and it was not until April 2016 that the Committee found any violation. The Committee's and Council's decision making on the issue of "substantial" and "persistent" remained opaque and apparently subjective without tether to facts.

*Pre-May 2018 Decision Letters*

The failure to communicate reasons for adverse conclusions was a consistent practice by the Committee and Council, beginning with the June 2015 Committee decision letter. Some examples are:

- In its June 2015 letter, the Committee requested information to show compliance with Standards 301(a) and 309(b), solely on the basis of a finding about a decline in the 25th percentile LSAT scores. There were no findings cited for the request that related to the rigor of the program of education, its preparing graduates for admission to the bar, or academic support.

-  In its May 2016 decision letter, the Committee went beyond the June 2015 letter and concluded that the School was not in compliance with Standards 301(a) and 309(b). Again, it did so without citing *any* negative findings about the program of legal education or academic support.

- In its October 2016 decision letter, the Committee concluded that the "issues of non-compliance" had been substantial and persistent, without citing a single finding of fact. In that same letter, the Committee recommended that the Council impose probation without citing any findings of fact to justify that sanction as opposed to any other.

- The Council's March 2017 decision letter simply adopted the Committee's October 2016 letter and made no new findings.

It was not until the Council's May 2018 Decision Letter that either the Council or Committee purported to give detailed reasons for adverse conclusions. But, as we have seen, all of these reasons are spurious or irrelevant and none justifies the conclusions of the May 2018 letter.

**Consistency**

*Changing the Interpretation and Application of Standards Over Time and Without Notice*

The September 2014 Accreditation Committee decision letter was unremarkable and reflected the approach to the reading of the Standards and the application of the Standards that the Committee had been following for many years. In mid-2015, the Committee and Council sharply changed their approach. The Committee began to issue sweeping requests for information relating to admissions and academic programs. The information sought in

these requests had hitherto had been collected through site inspections and requests were made even after a recent site inspection.

The Committee also began to focus on 25th percentile LSAT as highly determinative of compliance with Standard 501(b) and as a trigger for examination of compliance with Standards 301(a) and 309(b). The Committee also began to make conclusions of noncompliance without citing specific findings of fact, instead referring to an undifferentiated list of findings of fact whether or not relevant to a Standard. The Council and Committee also began to find that noncompliance (or, more accurately, issues of compliance) were "substantial" or "persistent," without any grounding in findings of fact, without explanation of criteria for "substantial" and "persistent," or analysis of any relationship between facts and criteria. The Council and Committee also began to regularly impose the hitherto rare sanction of probation.

The Council and Committee gave Schools no notice of these changes. They ignored repeated requests for clarification. And the Managing Director never issued a Guidance Memo, despite the fact that such memos:

> [H]ave been adopted or when, in the course of the Office's dealings with schools about compliance with the Standards, a number of schools are asking for clarification or direction regarding a particular Standard, Interpretation, or reporting requirement.[122]

Fourteen Guidance Memos have been issued since 2015, not one dealing with the Standards 301(a), 309(b), or 501(b). Moreover, in 2014, the Managing Director issued a Guidance Memo dealing with transition to recently adopted *written* Standards and Rules. No Guidance Memo was issued regarding transition to the Council's and Committee's new, *unwritten* Standards and Rules.

*Applying Standards Differently to Similarly Situated Schools*

The Council's and Committee's intense focus has been on 25th percentile and median LSAT as a dominant, if not dispositive, basis for compliance with Standard 501(b). This focus on a publicly available metric allows one to compare the harsh treatment of ASLS with that of similarly situated law schools.

For example, the School's 2017 entering class had a 25th percentile and median LSAT of 146 and 149, and the School admitted no applicants with an LSAT score below a 143. There were ten schools[123] whose bottom quartile for the 2017 entering class was below a 143. For each of these ten schools, at least 25% of their entering students would have been

---

[122] https://www.americanbar.org/groups/legal_education/accreditation/consultants_memos.html.
[123] Pontifical Catholic University of Puerto Rico, Interamerican University of Puerto Rico, Western Michigan University (Thomas Cooley), University of Puerto Rico, Appalachian School of Law, Texas Southern University, Southern University, Thomas Jefferson School of Law, Charleston School of Law, and North Carolina Central University. See Standard 509 Required Disclosures (2017), www.abarequireddisclosures.org

automatically denied admission to ASLS. Of these ten schools, only four[124] have been found out of compliance with Standard 501(b).

Similarly, the Law School's 149 median LSAT in 2017 is at or above that of 35 other law schools, only seven of which have been found out of compliance with Standard 501(b).

Moreover, as the table below reflects, ten law schools had first-time bar pass rates below 40% in 2016.[125] Of these ten, only two had *any* increase in 25th percentile LSAT between 2013 (when the 2016 graduates matriculated) and 2017: ASLS with a four-point improvement and La Verne with a one- point improvement.[126] Despite these facts, the Council voted to withdraw ASLS's accreditation while La Verne was granted full accreditation in March 2016 and has not subsequently received any public notice regarding noncompliance. Only four of the schools have received any public notification of noncompliance.

| School Name | First-time bar pass rate (2016) | 2013 25th percentile LSAT | 2017 bottom 25th percentile LSAT | Change in 25th percentile LSAT | 1L non-transfer attrition (2014 Standard 509) | 1L cohort non-transfer attrition (2017 Standard 509) | Previous ABA Public Notice |
|---|---|---|---|---|---|---|---|
| WHITTIER LAW SCHOOL | 22.7% | 145 | N/A | N/A | 22.6% | 12.9% | Voluntary closure |
| ARIZONA SUMMIT LAW SCHOOL | 34.4% | 141 | 145 | 4 | 7.8% | 27.2% | Accreditation withdrawn on June 5, 2018 |
| LA VERNE, UNIVERSITY OF | 32.7% | 146 | 147 | 1 | 14.3% | 12.1% | Awarded full accreditation on March 11, 2016 |
| INTER AMERICAN UNIVERSITY OF PUERTO RICO | 31.3% | 135 | 135 | 0 | 13.2% | 8.0% | None |
| SOUTHWESTERN LAW SCHOOL | 38.3% | 150 | 150 | 0 | 12.5% | 24.8% | None |
| SAN FRANCISCO, UNIVERSITY OF | 34.8% | 151 | 150 | -1 | 13.4% | 20.0% | None |
| GOLDEN GATE UNIVERSITY | 35.4% | 147 | 146 | -1 | 10.7% | 30.5% | Preliminary finding of non-compliance on April 10, 2018 |
| PONTIFICAL CATHOLIC UNIVERSITY OF P.R. | 35.7% | 132 | 131 | -1 | 9.9% | 6.8% | None |
| APPALACHIAN SCHOOL OF LAW | 33.3% | 143 | 141 | -2 | 8.6% | 10.8% | Specific remedial action on December 2017 |
| THOMAS JEFFERSON SCHOOL OF LAW | 37.3% | 144 | 142 | -2 | 26.3% | 37.2% | Probation in November 2017 |

Neither the Council nor the Committee nor the Managing Director have provided any information, privately or publicly, that enables ASLS and other schools to understand this disparate treatment.

*Ensuring Consistency*

Consistency is threatened where there are no controls to ensure consistency. Indeed, Department of Education regulations require an accreditor to have "effective controls against the inconsistent application of the [accreditor's] standards." It is plain from the record of decision making in this case that the Council and Committee do not have effective controls. One requisite for ensuring consistency is clear standards. But the Council and Committee have effectively supplemented or displaced the written requirements of key Standards and Rules with their own unwritten, non-public requirements. This facilitates inconsistent decision making. Further facilitating inconsistency are the facts that the membership of the Council and Committee are continually changing; that experience with the Standards and Rules is not a requirement for membership on the Council or Committee;

---

[124] Appalachian School of Law, Texas Southern University, North Carolina Central University, and Thomas Jefferson School of Law. See Standard 509 Required Disclosures (2017), www.abarequireddisclosures.org.
[125] See
http://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/Questionnaires/2018_bar_passage_data.xlsx.
[126] See ABA Required Disclosures at: http://abarequireddisclosures.org/Disclosure509.aspx

and there does not appear to be any index of determinations of compliance or non-compliance, or of implementations of a Rule of Procedure, categorized by Standard or Rule and elements of them.

### *Fairness*

*Failure to Treat Parties with Open-Mindedness and Respect*

A good example of the failure to treat parties with open-mindedness and respect is from the March 11, 2017 Council hearing. The dean and others had explained at length how the School used data in admissions decision making, explained at length the basis for the School's confidence in the data and its use, and how it was not until the July 2015 bar examination that the School came to realize that the form of data-based decision making it had been using was no longer reliable and that a new predictive model was needed.

Notwithstanding these clear and detailed explanations, the following exchange took place at the end of the questioning:

> CHAIR MURPHY: And Ms. Bosse described the decline particularly in the lower quartile, seven point decline. As I understand your -- if I understood your statement earlier, you didn't appreciate what a seven point decline in the lower  - in the 25th percentile would mean to the likely prospects of the graduates of the school; is that true?

> DEAN WILLRICH: Well, it's not a matter of not appreciating it, it's based upon the information that we had at the time. We didn't realize that that would happen. We weren't able to -- able to see the end result until 2015, when -- when bar results began coming in for those classes with those low indicators.

> CHAIR MURPHY: Well, I suggest to you that's remarkable.[127]

The contempt behind the Chair's comment is palpable.

### *Prejudgment*

The above statement by the Chair is one example of prejudgment by the Council and Committee. There are many others, but the May 2018 Decision Letter in itself constitutes the most striking example. The letter is filled with illogic, disregard for the language of Standards and Rules, disregard of inconvenient facts, disingenuous readings of data, failure to give notice of a concern so that the School could be prepared to address it, repeated confusion of targets in the School's Reliable Plan with the requirements of the Standards,

---

[127] Council Hr'g March 11, 2017, Tr. 40:2-18.

giving absurd readings to a mere typographical error, refusing to extend the time to show compliance because the School might need the extension of time, and much more. Every one of the Council's findings in that that letter is infected with one or more forms of serious disregard for the norms of decision making.

The members of the Council are intelligent individuals who are highly educated and experienced in sophisticated analysis and critical decision making. It is a reasonable inference the Council could not issue a decision with such a morass of errors unless the proffered reasons for the decision are just veneer to prejudgment.

*Failure to Provide Notice and an Opportunity to Respond Before an Adverse Decision*

The Committee and Council have repeatedly failed to give the Law School notice of a new ground for making an adverse decision and an opportunity to respond. To take one such example, the Committee's June 2016 decision letter concluded that "issues" of the School's non-compliance with the Standards were "substantial" and "persistent." The School had no notice that the Committee would examine that question and no opportunity to respond before the Committee rendered its decision.

Moreover, while only the Council that had the authority to impose probation on the basis of such a conclusion, the Council made it very clear that it was *unwilling to allow evidence on the unexpected issue that had not been introduced below*. At the March 11, 2017 hearing before the Council, the Chair, after the dean's introductory statement, opined as follows:

> CHAIR MURPHY:  Thank you, Dean.  I'll just offer a comment based on my review of the record. Most, if not of all, of what you presented was in  the -- it appears to me, subsequent to the Accreditation Committee hearing.  We'll have to sort through that, but I just wanted to advise you that  based on my review, that's the case.[128]

### Reasonableness

*Failure to Base Decisions on All Relevant Facts*

The Committee and Council have repeatedly issued decisions not based on all relevant facts. This failure has taken five principal forms.

First, the Committee and Council have found non-compliance with a Standard by ignoring facts showing compliance cited in the letter. For example, the May 2016 decision letter finds the School out of compliance with Standard 301(a) but cites only findings that show *improvements* in the program of education.[129]

Second, the Committee and Council have ignored material facts showing compliance available in the record. For example, in that same decision letter the Committee disregards

---

[128] Council Hr'g March 11, 2017, Tr. 17:5-11.
[129] Acc. Comm. Dec. Concl. ¶ 1(a) (May 2016).

the highly material fact that the School was in compliance with Standard 316. The express language of Standard 316 makes this latter fact dispositive for compliance with one key elements of Standard 301(a).

Third, the Council has tried to preclude the School from introducing evidence relevant to issues of compliance. It has done this in hearings[130] and at the outset of the May 2018 Decision Letter.

Fourth, the Committee and Council have materially misstated the record. For example, in paragraph 1(b) of the May 2018 Decision Letter, the Council points to the date of certain students' matriculation as if it were the date of their admission. And in paragraphs 2(a)-2(b), the Council treats a chart distributed to students as if it were—contrary to fact—a condition of probation, ignoring the fact that it was *different* chart that had been required as a condition of probation. It then concludes that the fact that the non-required chart did not comply with the requirements for the required chart, the School violated the terms of probation.

Fifth, the Committee and Council have persistently ignored the impact of their own actions on the School's ability to come into compliance with the Standards. Most significantly, they have:

- Ignored the issue of the impact of probation on student voluntary withdrawals and consequently on non-transfer attrition levels.

- Ignored the issue of the impact of probation on transfer attrition and consequently for bar passage rates and classroom environment.

- Ignored the issue of the impact of probation on the School's ability to recruit and retain academic support staff.

- Ignored the issue of the impact of probation on the School's ability to come into compliance with the Standards within two years.

*Failure to Base Decisions on Sound Logic*

Several examples of the Council's and Committee's indulgence in illogic were described in review of the May 2018 Decision Letter. A good example is the strange reasoning that the School should not be allowed an extension of time under Rule 14 because it may need the extension of time. Most of the examples of unsound logic are found in the May 2018 Decision Letter because it was not until that letter that Council even tried to advance reasons for its adverse conclusions. The fact that the Council had to resort to illogical arguments highlights the lack of genuine reasons for the adverse decisions.

---

[130] Id.

*Imposing and Maintaining Penalties Unrelated to their Purposes*

The Committee and Council decided, without explanation, that the School's asserted non-compliance with the various Standards was "substantial" and "persistent." They thereupon imposed probation without any justification or any explanation of why the sanction should be probation, as opposed any other.[131] They failed to explain why it the sanction should be public—which would inevitably impede remediation—rather than private.  Subsequently, after the School made substantial progress to bring itself into compliance with the Standards in question and to improve its program of education and operations, the Council and Committee declined to remove probation or replace it with a lesser sanction.

Probation has several purposes: to serve as a warning to other schools; to express a heightened level of disapproval; or to provide notice to students and the public. These purposes can equally well be served by lesser sanctions or forms of remedial relief. It is not a proper purpose to impose or maintain probation in order to bring about the termination of the school. If it were, the appropriate sanction would be the immediate withdrawal of accreditation and probation would simply prolong the harm to students, faculty, staff, and other law school constituents.

The initial imposition of probation on ASLS might arguably have served one of the three purposes noted, but so, too, could one of the lesser sanctions. However, the continuation of probation: (a) *after* the warning to other schools had been given; (b) *after* the Council's disapproval had been made clear; (c) *after* students had duly been notified; and (d) *after* the School had undertaken substantial improvements to its program of legal education and admissions practices and policies, *was never justified by the Council and Committee.* Nor could it. At that point, the only function of probation was to interfere with recruiting and retaining students, recruiting and retaining faculty and staff; making it difficult for graduates to gain employment; and otherwise impeding the ability of the School to comply with the underlying Standards. In short, the only purpose of continuing probation would be to impede compliance with the Standards and push the School further down the slope to the its doom.

**Alignment**

*Failure to comply with Department of Education regulations and other legal requirements.*

The Council and Committee have consistently flouted some of the core requirements of accreditors. These requirements include (34 CFR Part 602):

> §602.17 Application of standards in reaching an accrediting decision. The agency must have effective mechanisms for evaluating an institution's or program's compliance with the agency's standards before reaching a decision to accredit or

---

[131] Including lesser sanctions that had been imposed on other schools (Ave Maria and Valparaiso) for similar non-compliance.

preaccredit the institution or program.  The agency meets this requirement if the agency demonstrates that it - -

(f)  Provides the institution or program with a detailed report that assesses--

(1)    The institution's or program's compliance with the agency's standards, including areas needing improvement.

§602.18 Ensuring consistency in decision-making. The agency must consistently apply and enforce standards that respect the stated mission of the institution, including religious mission, and that ensure that the education or training offered by an institution or program, including any offered through distance education or correspondence education, is of sufficient quality to achieve its stated objective for the duration of any accreditation or preaccreditation period granted by the agency. The agency meets this requirement if the agency - -

(a)  Has written specification of the requirements for accreditation and preaccreditation that include clear standards for an institution or program to be accredited;

(b)  Has effective controls against the inconsistent application of the agency's standards;

(c)  Bases decisions regarding accreditation and preaccreditation on the agency's published standards;

(e)  Provides the institution or program with a detailed written report that clearly identifies any deficiencies in the institution's or programs compliance with the agency's standards.

§602.25 Due Process. The agency must demonstrate that the procedures it uses throughout the accrediting process satisfy due process.  The agency meets this requirement if the agency does the following:

(c)  Provides written specification of any deficiencies identified at the institution or program examined.

These requirements, as well as legal standards relating to due process, are the subject of a lawsuit by the School against the ABA (Civ. No. 2:18-cv-01580 D. Ariz.) and the allegations of the complaint need not be repeated here. Many of the arbitrary and capricious actions and decisions described in this Appeal also violate these legal requirements.

The cavalier attitude of the Council and Committee toward these due process requirements is illustrated by the following exchange at the March 11, 2017 Council hearing:

MS. BOSSE:   Okay.   Thank you.   Are you satisfied that you have received appropriate due process in these proceedings of -- fair notice of the standards at issue and opportunity to be heard on these issues?

DEAN WILLRICH:   I don't have any objections at this time to the due process.[132]

This was a surprise question sprung on a very new dean who, as is clear from the record, had not participated in prior Council and Committee proceedings. The School had not to that point raised any due process objections and there was no reason for the new dean to be prepared to address due process issues.

*Acting inconsistently with prevailing norms among higher education accreditors.*

The United States higher education system is distinctive among national systems for the regulation of higher education institutions. Unlike most other systems, this one is *voluntary, rather than government-controlled,* and based on *peer evaluation.* This longstanding system has evolved norms beyond what is required by Department of Education regulations. These norms are exemplified in the standards, rules, and statements of good practice of accreditors. They are also found in the publications of the Council on Higher Education Accreditation (CHEA), the leading national organization of accreditors and participants in the higher education system.

Some of these norms are the same as what are found in the ABA Standards and Rules, such as fairness, transparency, and consistency. But some are either lacking or ignored in the ABA law school accreditation system. For example, norms for development or modification of standards typically call for school participation in the process and the use of research and feedback.[133] As this Appeal shows at length, the Council and Committee have thoroughly disregarded this norm through their practice of creating unstated amendments and glosses to Standards and Rules.

The deeper problem, however, is that the ABA has renounced the basic norms that: (a) an accreditation system should be designed and implemented to promote and facilitate institutional improvement; and (b) an accreditation system should be designed and implemented so as to respect the distinctive missions of the various schools in the system.

With regard to facilitating improvement, examples abound in the standards, guidelines, and culture of the regional accreditors. For example, the WASC Senior College and University Commission (WSCUC) makes an express commitment to "[a]ssist and stimulate improvement in its institutions' educational effectiveness" and it publishes "[g]uides, offering principles and

---

[132] Council Hr'g March 11, 2017, Tr. 39:6-12.
[133] E.g., New England Association of Schools and Colleges, Commission on Institutions of Higher Education, Standards, Preamble (2016), https://cihe.neasc.org/standards-policies/standards-accreditation/standards-effective-july-1-2016#preamble.

examples of good practice."[134] The Higher Learning Commission (HLC) states as guiding policy that:

> HLC includes improvement as one of two major strands in all its pathways, the other being assurance that member institutions meet the Criteria and the Federal Requirements.

> A process of assessment is essential to continuous improvement, and therefore a commitment to assessment should be deeply embedded in an institution's activities. Assessment applies not only to student learning and educational outcomes but to an institution's approach to improvement of institutional effectiveness.[135]

With regard to respecting school mission, here, too, examples abound. The WSCUC accreditation process is aimed at "[d]eveloping systems of institutional review and evaluation that are adaptive to institutional context and purposes."[136] Similarly, the HLC policies state that:

> HLC understands and values deeply the diversity of its institutions, which begins from the diversity of their missions. Accordingly, mission in some degree governs each of the Criteria. HLC holds many expectations for all institutions regardless of mission, but it expects that differences in mission will shape wide differences in how the expectations are addressed and met.[137]

And one of CHEA's ten core principles for accreditors is that:

> Standards and the application of standards that address structure, resources and program personnel are to enable institutions, schools and programs to be creative and diverse in determining how to organize themselves structurally, how best to use their resources and what personnel and other policies and procedures are needed to achieve student learning outcomes.[138]

In disregarding these norms, the ABA sees itself as a multi-function enforcement agency, whose purpose is to prosecute, judge, and punish, rather than to help schools achieve their mission and comply with Standards. In doing so, the ABA has set aside what, for a century, had been its primary focus: educational quality and what takes place in the classroom. The ABA has instead based prosecution, judgment, and punishment on: (a) easily measurable

---

[134] WSCUC Code of Good Practice and Ethical Conduct ¶ 7, https://www.wscuc.org/resources/handbook-accreditation-2013/part-i-2013-handbook-and-wasc-accreditation/commission-code-good-practice-and-ethical-conduct.

[135] https://www.hlcommission.org/Publications/guiding-values.html.

[136] https://www.wscuc.org/about/purposeofaccreditation.

[137] https://www.hlcommission.org/Publications/guiding-values.html.

[138] Council for Higher Education Accreditation, Statement on Good Practices and Shared Responsibility in the Creation and Application of Specialized Accreditation Standards, Principle 9 (September 2001), https://www.chea.org/userfiles/CHEA%20Advisory%20Statements/statement_standards_01.pdf.

data points only tangentially related to the evaluation of education quality; plus (b) subjective impressions of a school. The irony is that, in so doing, the ABA has made itself less like an accreditor and more like *U.S. News & World Report*, which the ABA has justifiably viewed as a pernicious influence on legal education.

## CONCLUSION AND REQUEST FOR RELIEF

It is never easy to hold a decision or conduct arbitrary or capricious, particularly when the decision or conduct is by colleagues and peers. Yet, it is inescapable that the Council and Committee have repeatedly made decisions and engaged in conduct that violates basic norms of proper decision making and basic fairness. Their unreasonable and unjustifiable course of action has now resulted in a final decision to revoke accreditation—to put the School to death and inflict enormous harm and disruption on students. That decision builds on and further exemplifies the pattern of conduct and decision making that is arbitrary and capricious and inconsistent with the Department of Education regulations for accreditors.

We thus seek immediate relief for ASLS from the Council's decision, specifically:

- Reversal of the withdrawal of accreditation;

- Removal of probation; and

- A determination that the School is in compliance with Standards 301(a), 309(b), and 501(b) and Interpretations 501-1 and 501-2 or, alternatively, an extension of time under Rule 14(c) for a finding of compliance with these Standards and Interpretations.

Although reversing the Council's decision may be unpleasant, it is essential. For, as shown here, the actions of the Council and Committee have been deeply harmful not only to ASLS and other law schools that have been subject to similar treatment (as well as their students and alumni). They are deeply harmful to the integrity of the law school accreditation system and public confidence in that system. This harm threatens to continue, if not accelerate.

As we said at the beginning of this document, we agree with and are committed to the basic goals of the law school accreditation system: ensuring quality education, protecting the interests of students, and ensuring public confidence. But as we have shown in detail through the foregoing review and analysis, the Council and Committee chose to pursue those goals in the wrong way: through decision making and action that is utterly contrary to the purposes stated in Rule of Procedure 1, to "promote consistency, fairness, and transparency." And because those methods contravene Department of Education regulations, they jeopardize the ABA's status as a recognized accreditor, and so must be brought to an end.

Respectfully submitted,

_____                    _____
Penny Willrich,                            C. Peter Goplerud
Interim Dean                               Interim President